ROGERS, Justice.'
 

 At the regular session of 1940, the Legislature of Louisiana adopted a joint resolution which was designated as Act 384, proposing amendments to the Constitution of Louisiana, relative to the form of the organization of the Executive Department of the state government and a unified and comprehensive system of financial administration. The proposal affected six articles of the Constitution and provided for the repeal of twenty sections, the amendment of eight sections, and the addition of seventeen new sections. The resolution was submitted to the voters at the general state election held on November 5, 1940, as the proposed constitutional amendment No. 3, or Act 384 of 1940, and according to the election returns, was adopted by a majority of 6,667 votes in a total of 274,419 votes cast upon the proposition.
 

 Shortly after the returns of the election were promulgated, the constitutionality of Act 384 of 1940 was assailed in a suit brought by six residents and taxpayers of the Parish of East Baton Rouge. After the hearing on a rule nisi, the trial judge held that the constitutional amendment was unconstitutional and he granted plaintiffs a preliminary injunction against the State Treasurer and the State Auditor prohibiting them from acting under its authority.
 

 On March 20, 1941, upon the application of the State Treasurer and the State Auditor, the case was brought to this Court by certiorari. April 28, 1941, was fixed as the return day, and on that day the case was submitted on the record and the briefs of the parties as provided by the rules of this Court.
 

 While the case was under consideration by the Court, the Attorney General filed a motion on behalf of the relators requesting the Court to suspend its rules and permit the case to be re-opened and orally argued, because of the importance of the issues involved therein. The motion was granted and on June 2, 1941, the case was extensively argued by counsel representing the parties, after which it was re-submitted. On June 30, 1941, the Court handed down its
 
 *142
 
 opinion and decree affirming the judgment of the judge of the district court. Relators’ application for a rehearing was denied on July 18,1941. Graham v. Jones, 198 La. 507, 3 So.2d 761.
 

 The decision of the judge of the district court declaring the proposed reorganization amendment invalid provoked a storm of criticism by certain leaders and adherents of the political faction that had sponsored the proposal and by the editors of certain newspapers who were ardent supporters of that faction. The opinion was freely expressed by the vocal critics and by the editorial writers that the decision of the judge of the district court was wrong and that the wrong would be righted by the Supreme Court. The tenor of the speeches and the editorials plainly indicated a desire on the part of those responsible therefor to influence, through a cultivated public clamor, the members of the Supreme 'Court when they were called upon to review the decision of the district court.
 

 As we have stated, the case involving the attack on the constitutionality of the proposed reorganization amendment was orally argued and submitted to the Court for its decision on June 2, 1941. A few days later, on June 6, 1941, while the case was under consideration by this Court, an editorial headed “No State-Sabotage” appeared in the New Orleans Item, one of the afternoon newspapers published in the City of New Orleans. This editorial deplored the attack* on-the proposed reorganization amendment, suggested that the proposed change in the fundamental law represented the people’s will, and that if that will were defeated, it would require the holding of a constitutional convention which “could and would correct any undoing or defeat of the People’s expressed will, and also deal with the undoers.”
 

 On June 8, 1941, the Sunday Item-Trib.une, a newspaper formerly issued on Sunday morning by the publishers of the New Orleans Item, contained a leading article entitled “People Can Alter Law,” quoting extensively from briefs filed on the part of the defendants. The article, among other things, directed particular attention to the following statement appearing in the briefs: “What the plaintiffs are asking in this case is that the seven gentlemen who comprise the Louisiana Supreme Court set their will against the will, not only of the legislature of Louisiana, but of the great majority of the people thereof.”
 

 Appearing on the front page of the Sunday Item-Tribune, issued on June 15, 1941, was an article entitled “Constitutional Convention is Talked.” The article is written by Harnett T. Kane, one of the feature writers employed by the newspaper, who referred to the fact that the holding of the first constitutional convention in twenty-one years was talked of “as the Supreme Court ponders an attack on * * * the reorganization of Louisiana’s state government.” The writer of the article stated that some persons thought a special session of the legislature would be convened by the Governor to call a constitutional convention to alter the fundamental law of the State. The writer further stated, “This (the constitutional convention) would be planned to give the state sound reorganization by an
 
 *144
 
 other method. A convention can change the rules of the game from top to bottom, and alter the political destinies of men and women in every office, City, State, high and low.”
 

 On June 8, 1941, the Times-Picayune carried a headline printed in extra large type declaring “State Defends Reorganization Act.” The article to which the headline referred itself bore the following title: “Attorneys Assert Right of People to Alter Constitution,” and was carried over from the front page to two other pages of the newspaper. The article quoted extensively from a supplemental brief filed in this Court by the attorneys for the relators, Tugwell and Baynard, in which it was stated, among other things:
 

 “The people’s right to amend their fundamental law stands as an eternal beacon in the democratic process.
 

 “It is a right not to be treated lightly either by the judiciary, the executive or the Legislature”: also, that “if this suit can be maintained by persons who are neither residents, citizens or taxpayers of Louisiana * * * it means that the administration of government in Louisiana will become chaotic and impossible and that the supreme court, and not the governor, will assume the executive functions. This, of course, the Louisiana supreme court will refuse to do.”
 

 The issue of June 11, 1941, of the Times-Picayune contained an editorial entitled “People’s Right and Purpose.” In this editorial it was stated that the “advocates and beneficiaries of the old spoils system and last-ditch fighters against good government are aligned with the attackers” of the proposed amendment. It was also stated in the editorial that: “The long record of recognizing and maintaining the validity of constitutional changes will be broken now only at the cost of voiding a most important change in the basic law, approved by the people in their own interest. The state must count it a great misfortune if it happens to be the reorganization amendment that becomes the first popularly ratified change in' our constitution to fall victim to a court decision.”
 

 In the New Orleans States, an afternoon newspaper owned by the publishers of the Times-Picayune, appeared in the issues of June 5, June 6, June 7, June 9, June 19, and June 23, 1941, articles and editorials commenting upon the proposed reorganization amendment. The issue of June 5th contained a caustic editorial entitled “We the People.” On the first page of the issue of June 6th appeared an article with the lead heading “Suffering Predicted if Jones Act Is Ruled Out.” Act 384 of 1940 was the legislative act referred to as the “Jones Act.” The issues of the States of June 7th, June 9th, June 17th, June 19th and June 23rd contained editorials entitled, respectively, “A Week-end Thought”; “Let’s Hope Constitutionality of the Reorganization Act Is Upheld by Supreme Court”; “Don’t Cripple Louisiana”; “Twisted Figures and Ravings by Evil and Misinformed Persons Can’t Beat Facts”; “All State Governments Must Be Strong If America Is to Lead Fight for Freedom.”
 

 In the last mentioned editorial the writer-used the following language: “Right now,
 
 *146
 
 America needs all of its strength to battle the powers of evil that are seeking to dominate the world. Those who would weaken the power of Louisiana, those who would undermine its institutions, those who would curtail the power of its government, are just as much fifth columnists as those who are fighting America, those who are seeking to undermine our institutions.” Further on in the editorial, the writer made this statement: “The people voted for reorganization of our state affairs. They voted to take the government out of the hands of the bosses, and restore it to the people. So why all the opposition to the. reorganization plan as passed by the Legislature and ratified as a constitutional amendment by the people? Are the views of the people to be scorned? Are they to be nullified? Are the people-to be treated as slaves ? ”
 

 The day after the opinion and decree of this Court, with five Justices concurring and two Justices dissenting, was handed down affirming the judgment of the lower court, on June 30, 1941, and pending the application for a rehearing, the three newspapers, the Times-Picayune, the New Orleans States, and the New Orleans Item, commented editorially upon the decision. On July 1, 1941, the Times-Picayune, in an editorial entitled “Reorganization Ruled Null,” referred by name to the five concurring Justices and to the two dissenting Justices. The gist of the editorial was that the decision would require the “unscrambling” of many departments, bureaus and other agencies established by the reorganization amendment, destroying much of the economy and the efficiency for which the people voted and for which the Legislature made provision in the 1940 session.
 

 In the issue of the New Orleans States of July 1, ■ 1941, appeared an editorial entitled “No Appeasement in Battle to Prevent the Old Days of Loot and Slavery.” This editorial, as did the editorial of the same date ira the Times-Picayune, referred by name to the five concurring Justices and to the two dissenting Justices, and also to a radio address by the Governor of the State. After' stating that “the people of Louisiana will never give up the'fight for decency and honesty in government,” and that they would never supinely allow the former state administration machine, which “looted the state of millions and kept its citizenry in slavery, again to come back into power,” the writer of the editorial declared:
 

 “It was with a spirit of admiration, even elation, that the people heard the governor proclaim: ‘The fight is on, the challenge is accepted, there will be no appeasement. The people’s Legislature, expressing their voice, voted ,the proposed amendment with only five dissenters in 139 members of both houses. Neither the people nor your government are going to be denied their rights.’ * * *
 

 “The Governor then went on to declare that if reorganization can be set aside, so can many beneficial laws which make for good government.”
 

 The Governor “is right in continuing the fight. He will have behind him all elements that believe in democracy, that believe in the rule of the good and the confounding of the evil.
 

 “Only cravens surrender. It is not the American way. It was not the American
 
 *148
 
 way at Valley Forge. It is not the American way now in dealing with Hitler. It is not the Louisiana way in dealing with the old * * * machine.”
 

 In the issue of July 2d appeared an editorial in the New Orleans States entitled “Minority Opinion of Supreme Court Shows How Election on Amendments Was Called.”
 

 On July 1, the New Orleans Item, as did the Times-Picayune and the New Orleans States, commented editorially on the decision of this Court on the reorganization amendment handed down the previous day. The editorial was entitled “Reorganization.” Among other things, the writer of the editorial stated: ■
 

 “That the ruling of the Court, if confirmed, will result in incalculable confusion in the State’s business, in corresponding losses to its people, and in deplorable reaction to old levels of public mismanagement, is not disputed by anybody.”
 

 After stating that the technical considerations advanced by the majority opinion had no weight with him, the writer of the editorial declared, 'in substance, that regardless of what the courts might do, the constitutional amendment was something the free people of this State wanted; that they had voted for it, and “What the people of this State want they can have if they are willing to fight for it.”
 

 The issue of the New Orleans Item of July 4th contained an editorial entitled “Jones Accepts An Issue.” The Jones referred to is the Honorable Sam Houston Jones, Governor of the State. In the issue of July 5th appeared an editorial entitled “Not All Is Lost.” The first paragraph of this editorial reads as follows:
 

 “A great deal of the gay old Commonwealth of Louisiana will remain after the smoke raised by the Supreme Court ruling against the Re-organization Amendment clears away. The private and public annoyance, injury, and loss will undoubtedly be great. Nobody yet knows how great. But everybody who is injured will know it and can charge his hurt to those responsible for it., The rebellion of the People against a criminal despotism will by no means have been tough (sic) and won for nothing.”
 

 In the issue of the New Orleans Item of July 17th appeared an editorial entitled “Legislators Stand.” The first paragraph of this editorial reads as follows:
 

 “It must have gratified all disinterested citizens to read that an overwhelming majority of the State’s House of Representatives and also a majority of its Senate are ready to stand with the Governor for whatever steps are possible to repair the damage done by the Supreme Court’s invalidation of the Reorganization program. Yet it could not have been otherwise. For no conscientious legislator, unless unbalanced or unduly swayed by factionalism could take any other position.”
 

 In line with the attitude adopted by the editorial writers of the three newspapers of New Orleans, a number of meetings were held by ward and precinct organizations of the political faction that sponsored the reorganization amendment, at which meetings addresses were made and resolutions were passed denouncing government by courts,
 
 *150
 
 condemning the five members of the Court who had subscribed to the majority opinion and suggesting that retaliatory measures should be taken against them.
 

 Confronted by the situation resulting from the aforementioned publications, speeches and resolutions, the plaintiffs in the suit attacking the constitutionality of the proposed reorganization amendment through their attorneys, on June 28, 1941, and July 25, 1941, while the case was pending before this Court on the application of relators for a rehearing, filed eleven separate rules for contempt involving the publishers and editorial writers of the three newspapers and a number of individuals not connected with the newspapers, but who had made addresses at, and had taken part in, the ward and precinct meetings to which we have referred. This Court set apart October 10, 1941, as the return day for all the rules for contempt. On that day, with a few exceptions, all the defendants appeared and filed their pleadings. The Court then continued the rules to be re-assigned and on October 17, 1941, they were fixed for hearing on December 8, 1941, when they were argued and submitted.
 

 We shall confine ourselves in the present discussion to the rules for contempt against the publishers and editors of the three New Orleans newspapers.
 

 The defendants in these rules admitted the publications and utterances referred to in the rules and the attached copies of the newspapers, but they denied that they were such as would justify this Court in holding defendants or any of them in contempt of its authority, and by way of exceptions they pleaded the freedom of speech and of the press as guaranteed by Section 3 of Article 1 of the Constitution of this State and by the First and Fourteenth Amendments to the Constitution of the United States.
 

 .The attorneys representing the plaintiffs say that in instituting these proceedings for contempt their first and paramount concern was to vindicate the authority and to maintain the dignity of the Court, and, secondly, to protect the rights of plaintiffs in their attack on the reorganization amendment. Plaintiffs’ attorneys are to be commended for their efforts to maintain the standing and dignity of this Court and the unrestrained- enforcement of its lawful powers in an orderly manner.
 

 Judicial decisions on the subject of contempt are numerous and variant in many particulars, but, in this State, for more than one hundred thirty-one years the courts have held that a publication in a newspaper commenting on proceedings in court, calculated to affect the courts of justice, may be punished as contempt. This principle was maintained in the cases of Territory v. Thierry, 1 Mart., O.S., 101, and Territory v. Nugent, 1 Mart., O.S., 103, 5 Am.Dec. 702, decided in 1810, two years before Louisiana was admitted into the Union as a State.
 

 In the cases of State ex rel. Brown v. Houston, 35 La.Ann. 1194, 1195, and State ex rel. Barthet v. Judge of Civil District Court, 40 La.Ann. 434, 4 So. 131, this Court held that the courts possess the inherent power to punish for contempt not only the parties to the litigation, but also offenders not connected with the controversy, when
 
 *152
 
 ever they impede or obstruct the process of court, disturb its proceedings, insult its officers, or commit any act which thwarts or interferes with its administration of justice.
 

 In State ex rel. Phelps and Baker v. Judge, 45 La.Ann. 1250, 14 So. 310, 40 Am.St.Rep. 282, it was held that a publication in a newspaper, read by jurors and attendants on the Court, which has a tendency to interfere with the unbiased administration of the law in pending cases, may be adjudged a contempt.
 

 This Court, many years ago, recognized that contempt of court is of two kinds,—that which is committed in open court, and that which is committed out of the view and hearing of the Court.
 

 In State ex rel. De Buys v. Judges of Civil District Court, 32 La.Ann. 1256, the Court, citing many authorities for the proposition, stated:
 

 “It has been held in many cases that the publication of an article in a newspaper, commenting on proceedings in court, then pending and undetermined, or upon the court, in its relation thereto, made at a time and under circumstances calculated to affect the course of justice in such proceedings, and obviously intended for that purpose, may be punished as a contempt, even though the court was not in session when the publication was made.” Although the Court expressed the view that each Judge of the Civil District Court had the power to punish for contempt, it set aside the contempt proceeding because of its irregularity.
 

 In State ex rel. Morton v. Meyers, 171 La. 313, 131 So. 31, it was held that in the absence of a constitutional inhibition, the Legislature may confer the power to punish for contempt.
 

 The Constitution of this State does not prohibit the courts from exercising their inherent power to punish for contempt. It merely restricts the power. Thus section 17 of Article 19 of the Constitution of 1921 provides: “The power of the courts to punish for contempt shall be limited by law.” The statutory provisions governing contempts of court are Articles 131 and 132 of the Code of Practice, Articles 11 and 12 of the Code of Criminal Procedure, and Section 124 of the Revised Statutes. None of these statutory provisions, except Article 131 of the Code of Practice, has any bearing on the questions presently under discussion.
 

 Article 131 of the Code of Practice declares that the Justices of the Supreme Court and of other courts in the State have the power to punish all contempt of their authority by fine not exceeding fifty dollars and imprisonment not exceeding ten days for each offense, and provides that neither publication nor utterance out of court after judgment shall be construed as a contempt and punished as such. The clear implication of this codal article is that the power of the courts to punish for contempt for publications or utterances out of court before judgment becomes final is approved by the legislative department. But neither the Constitution nor the statutes, to the extent that they approve the
 
 *154
 
 power of the courts to punish for contempt, define what the contempt shall consist of.
 

 At the time these proceedings were instituted and the publications on which they are based were made, the test agreed upon by the courts of this country, both Federal and State, as the true test for determining whether an act or publication amounted to a contempt, was whether the act or publication had a reasonable tendency to interfere with the orderly administration of justice before the courts. Among the Federal cases in which the rule was applied may be mentioned Ex parte Savin, 131 U.S. 267, 9 S.Ct. 699, 33 L.Ed. 150; Patterson v. Colorado, 205 U.S. 454, 27 S.Ct. 556, 51 L.Ed. 879, 10 Ann. Cas. 689; Toledo Newspaper Company v. United States, 247 U.S. 402, 38 S.Ct. 560, 62 L.Ed. 1186; Sinclair v. United States, 279 U.S. 749, 49 S.Ct. 471, 73 L.Ed. 938, 63 A.L.R. 1258. The author of the opinion in Toledo Newspaper Company v. United States was Chief Justice White, formerly a Justice of this Court. The author of the opinion in Patterson v. Colorado [205 U.S. 454, 27 S.Ct. 558, 51 L.Ed. 879, 10 Ann.Cas. 689] was Mr. Justice Holmes who, among other things, stated: “When a case is finished courts are subject to the same criticism as other people; but the propriety and necessity of preventing interference with the •course of justice by premature statement, argument, or intimidation hardly can be denied.”
 

 In Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 630, 69 L.Ed. 1138, the Supreme Court of the United States stated the then prevailing rule in the following language: “It is a fundamental principle, long established, that the freedom of speech and of the press which is secured by the Constitution, does not confer an absolute right to speak or publish, without responsibility, whatever one may choose, or an unrestricted and unbridled license that gives immunity for every possible use of language and prevents the punishment of those who abuse this freedom.”
 

 Among the cases cited in the Gitlow case is the case of the Toledo Newspaper Company. The following are a few of the cases decided by the highest state courts in which the rule that the reasonable tendency of the acts done is the proper criterion to be applied in cases involving alleged contempt: Bee Publishing Co. v. State, 107 Neb. 74, 185 N.W. 339; State v. Lovell, 117 Neb. 710, 222 N.W. 625; People v. Wilson, 64 Ill. 195, 16 Am.Rep. 528; Baumgartner v. Joughin, 105 Fla. 335, 141 So. 185; Bridges v. Superior Court, 14 Cal.2d 464, 471, 94 P.2d 983; Times-Mirror Company v. Superior Court, 15 Cal.2d 99, 103, 98 P.2d 1029.
 

 The opinion of the Supreme Court of Florida in Baumgartner v. Joughin contains a comprehensive statement of the rule as follows [105 Fla. 335, 141 So. 187] :
 

 “The essential characteristic of an alleged act of contempt, such as that here charged, is its tendency to obstruct the administration of justice. Such a contempt does not depend so much upon the particular intent of the contemnor as upon his act. And while a mere intent to commit a contempt cannot make an act contempt, unless the act done actually tends
 
 *156
 
 to obstruct the administration of justice, whether or not an act constitutes a contempt of court is determined by the reasonable tendencies of the act to obstruct the administration of justice.”
 

 In support of its statement, the Court cites the cases of Ex parte Savin and Sinclair v. United States, which we have hereinabove referred to.
 

 In the Bridges and the Times-Mirror Company cases, the Supreme Court of California sustained convictions for contempt resting upon comments pertaining to .pending litigation which were published in certain newspapers. The cases were carried by certiorari to the Supreme Court of the United States where they were argued and re-argued. They were decided on December 8, 1941, the same day on which these contempt proceedings were argued and submitted for decision. In the two California cases, the Supreme Court of the United States, with five Justices concurring and four Justices dissenting, departed from the “reasonable tendency” rule obtaining in contempt proceedings and substituted therefor the rule of “clear and present danger.” The Court held that the constitutional right of freedom of speech and of the press extends to publications concerning pending judicial proceedings and that the clear and present danger of substantive evils as a result of such publications must be extremely serious and the degree of imminence extremely high before the utterances can be punished. Bridges v. California (Times-Mirror Co. v. Superior Court), 62 S.Ct. 190, 193, 86 L.Ed. -.
 

 A mere reading of the newspaper editorials, excerpts from which we have hereinabove reproduced, is sufficient to convince the impartial mind that the language employed by the writers to express their disapproval of the decision of this Court holding the reorganization amendment unconstitutional, goes far beyond fair and reasonable criticism of that decision. No judge should, and no judge does, resent honest and decent criticism of his judicial pronouncements. Such criticism may be helpful in the due administration of the law, but it can not be truthfully said that a publication, the clear purpose of which is to ridicule the court’s decision, to create an atmosphere of disapproval therewith in the public’s mind, and to intimidate the judges who subscribe thereto, is such a respectful and impartial criticism as will aid the court to rectify error.
 

 When the editorials under review here are considered in connection with the extensive publicity that already had been given the pending suit, involving as it did the validity of a constitutional amendment providing for such a drastic change in the form of our State government, and the large circulation throughout the State enjoyed by the three New Orleans newspapers, it can not be disputed that the editorials tended materially to affect the orderly administration of justice in the proceeding to which they refer and which was then pending in this Court. Such being the effect of the editorials, the acts of writing and publishing them were clearly contempts of this Court in which the suit was pending. And if it were not for the repudiation by the decision of the Supreme
 
 *158
 
 Court of the United States in the Bridges and Times-Mirror Company cases, of the reasonable tendency rule and the overruling, in effect, of the jurisprudence, refusing to extend the constitutional protection of liberty of the press and freedom of speech to such acts, it would be the duty of this Court to inflict such punishment upon the offenders as their contemptuous acts deserved.
 

 As we appreciate the decision of the Supreme Court of the United States in the Bridges and Times-Mirror Company cases, it not only requires that there must be a clear and present danger that a publication out of court will influence its decision in a pending case, but it even goes further. For the Court, in the course of its opinion, says:
 

 “Moreover, the likelihood, however great that a substantive evil will result cannot alone justify a restriction upon freedom of speech or the press. The evil itself must be ‘substantial’ * * *; it must be ‘serious’ * * *. And even the expression of ‘legislative preferences or beliefs’ cannot transform minor matters of public inconvenience or annoyance into substantive evils of sufficient weight to warrant the curtailment of liberty of expression. * * *
 

 “What finally emerges from the ‘clear and present danger1 cases is a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished. Those cases do not purport to mark the furthermost constitutional -boundaries of protected expression, nor do we here. They do no more than recognize a minimum compulsion of the Bill of Rights. For the First Amendment does not speak equivocally. It prohibits any law ‘abridging the freedom of speech, or of the press.’ It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow.”
 

 In applying the now recognized limited power of the courts to punish for contempt for indiscriminate publications regarding their judicial pronouncements, we can not truthfully say that the result of the publications under review here was to create a clear and present danger of substantive evils. Certainly, they had no influence on the members of this Court in their deliberations and in the conclusions reached by them in the suit involving the constitutionality of the reorganization amendment. Although the obvious purpose of the editorials was to force a decision by this Court in accordance with the conceptions which the writers were sustaining, there never was any clear and present danger that their purpose could or would be accomplished, as clearly appears from the decision itself.
 

 In these circumstances, and following the rule laid down by the Supreme Court of the United States in the Bridges and the Times-Mirror Coiflpany cases, these proceedings for contempt must be discharged.
 

 For the reasons assigned, the rules for contempt herein instituted against the Item Company, Inc., the Item Company, Ltd., Marshall Ballard, the Times-Picayune Pub
 
 *160
 
 lishing Company, Inc., Leonard K. Nicholson, James E. Crown, and George W. Healy, Jr., are discharged.