**JOHN D. PENNEKAMP, and THE MIAMI HERALD PUBLISHING COMPANY, v. THE STATE OF FLORIDA.**

22 So. (2nd) 875

July 24, 1945

Stayed pending appeal U. S. Supreme Court.

June Term

En Banc

*Milam, McIlvane & Milam, Edward E. Fleming* and *Elisha Hanson* (Washington, D. C.) for appellants.

*J. Tom Watson,* Attorney General, and *George M. Powell,* Assistant Attorney General, for appellee.

*F. M. Hudson, James M. Carson, M. L. Mershon* and *Giles J. Patterson,* as amicus curiae.

TERRELL, J.:

On November 2, 1944, the Circuit Court of Dade County issued a citation to John D. Pennekamp and the Miami Herald Publishing Company, appellants, commanding them to show cause on a day certain why they should not be adjudged in contempt. The basis for the citation was two editorials and a cartoon published in the Miami Herald. The first editorial and the cartoon were published November 2, 1944, and was as follows:

"Courts Are Established—FOR THE PEOPLE

"The Courts belong to the people. The people have established them to promote justice, insure obedience to the law and to Punish Those Who Willfully Violate It.

"The people maintain the courts by providing the salaries of officials and setting up costly chambers and courtrooms for the orderly and dignified procedure of the tribunals.

"Upon the judges the people must depend for the decisions and the judicial conduct that will insure society—as a whole and in its individuals—against those who would undermine or destroy the peace, the morality and the orderly living of the community.

"In order that the courts should not be amenable to political or other pressures in their determination of matters placed before them, Florida Circuit Judges are called upon to

face the electorate less often than are other elective office holders.

"So long are their terms, in fact, that in Dade County no circuit judge, and only one judge of another court, has come to the bench by public choice in the first instance. All the others have been named by a governor to fill a vacancy caused by death or resignation, or similar circumstance.

"Judicial terms in Dade County run:
1. Six years each for six Circuit Judges.
2. Four years each for two Civil Court of Record Judges.
3. Four years for the judge of the Criminal Court of Record. .
4. Four years for the judge of the Court of Crimes.
5. Four years for County Judge.
6. Four years for Juvenile court judge.

"These twelve judges represent the majesty and the sanctity of the law. They are the first line of defense locally of organized society against vice, corruption and crime, and the sinister machinations of the underworld.

"It is beyond question that American courts are of, by and for the people.

"Every accused person has a right to his day in court. But when judicial instance and interpretative procedure recognize and accept, even go out to find, every possible technicality of the law to protect the defendant, to block thwart, hinder, embarrass and nullify prosecution, then the peoples' right are jeopardized and the basic reason for courts stultified.

"The seeming ease and pat facility with which the criminally charged have been given technical safeguard have set people to wondering whether their courts are being subverted into refuges for lawbreakers.

"This week the people, through their grand jury, brought into court eight indictments for rape. Judge Paul D. Barns agreed with the defense that the indictments were not properly drawn. Back they went to the grand jury for re-presentation to the court.

"Only in the gravest emergency does a judge take over a case from another court of equal jurisdiction. A padlock action against the Brook Club was initiated last spring before Judge George E. Holt, who granted a temporary injunction.

"After five months, the case appeared Tuesday out of the blue sky before Judge Marshall C. Wiseheart at the time State Attorney Stanley Milledge was engaged with the grand jury.

"Speedy decision was asked by defense counsel despite months of stalling. The State Attorney had to choose between the grand jury and Judge Wiseheart's court.

"The judge dismissed the injunction against the club and its operators. The defense got delay when it wanted a prompt decision from the court when it profited it.

"On October 10 Judge Holt had before him a suit by the state to abate a nuisance (bookmaking) at the Tepee Club.

"Five affidavits of persons who allegedly visited the premises for the purpose of placing bets were introduced by the State over the objection of the defendants.

"Judge Holt ruled them out, explaining in denying the injunction against the Tepee Club.

" 'The defendant cannot cross-examine an affidavit. The Court cannot determine who is testifying and whether belief can be placed upon such testimony . . . The fact that such affidavits were taken before the State Attorney does not give them any additional weight or value.'

"This may be good law, exact judicial evaluation of the statutes. It is, however, the character of legal interpretation which caused people to raise questioning eyebrows and shake confused heads in futile wonderment.

"If technicalities are to be the order and the way for the criminally charged either to avoid justice altogether or so to delay prosecution as to cripple it, then it behooves our courts and the legal profession to cut away the dead wood and the entanglements.

"Make it possible for the state's case, the peoples' case, to be seen with equal clarity of judicial vision as that accorded accused lawbreakers. Otherwise technicalities and the courts make the law, no matter what the will of the people and of their legislators."

The second editorial was published November 7, 1944, and is as follows:

## "WHY PEOPLE WONDER

"Here is an example of why people wonder about the law's delays and obstructing technicalities operating to the disadvantage of the state—which is the people—in prosecutions.

"After stalling along for months, the defense in the padlock case against the Brook Club appeared before Judge Marshall C. Wiseheart for a decision. The State Attorney was working with the grand jury. The court knocked out the injunction. There was speed, dispatch, immediate attention and action for those charged with violation of the law. So fast that the people didn't get in a peep.

"That's one way of gumming up prosecution.

"Another is to delay action . . ."

A motion to quash the citation was denied. Appellants then filed their answer in which they admitted full responsibility for each publication but denied any intention to misrepresent the facts or to charge the individual judges with wrongdoing. They avow that it was their purpose to correct abuses in the law of Florida and that they were protected in all they said by freedom of the press. The answer was supported by affidavits. On trial of the issue made by the citation and the answer, the court adjudged respondents guilty of contempt. A fine of $250.00 was imposed on Pennekamp and a fine of $1000.00 was imposed on the Miami Herald Publishing Company, the owner and publisher of the Miami Herald. From the judgment so imposed, an appeal and an appeal by certiorari were prosecuted. By opinion filed February 27, 1945, not yet reported, we held that appeal was the proper method to review the judgment.

A number of questions are urged but they all turn on that of whether or not the cartoon and the editorials were of such content as to warrant the judgment for contempt.

The appellants contend that this question must be answered in the negative because (1) the citation does not show a clear and present danger to obstruct or impede the

administration of justice, (2) the editorials related to matters concluded which under the common law and the law of Florida were not contemptuous, (3) the cartoon was ambiguous and was not contemptuous because the sworn return disavows any attempt to so apply it, (4) omission from the editorial of the fact that the state attorney had approved quashal of the indictments and that new indictments were present did not render them contemptuous, and (5) it does not amount to criminal contempt for a newspaper to comment editorially on what it considers erroneous court procedure with the view of eliminating technical defenses and improving the administration of justice.

Appellee contends on the other hand that the law of Florida as propounded in the case of In re Hayes, 72 Fla. 558, 73 So. 362, is controlling, that no question of pleading is involved and that the "clear and present danger cases" relied on by appellants are not pertinent, the reason being that each case is determined in the light of its environment, the test being whether the words used will create the substantive evil that Congress and the Legislature have the power to prohibit.

With the line of cleavage so drawn, let us examine the law of Florida on which the Hays case was predicated. Section Thirteen of the Declaration of Rights, Florida Constitution, provides: "Every person may fully speak and write his sentiments on all subjects being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech, or of the press . . . "

By act of the territorial council, November 28, 1928, it was provided that contempts may be punished by Florida courts after due notice but that nothing said or written in vacation to or of any judge or of any decision made by him shall be construed as contempt. Section 38.22, Florida Statutes 1941, provides that every court may punish contempts against it, but the punishment imposed by a justice of the peace shall not exceed twenty dollars fine or twenty-four hours imprisonment.

Sections 38.23 and 932.04, Florida Statutes 1941, are also pertinent here and are as follows:

"Section 38.23. A refusal to obey any legal order, mandate, or decree, made or given by any judge either in term time or in vacation relative to any of the business of said court, after due notice thereof, shall be considered a contempt, and punished accordingly. But nothing said or written, or published, in vacation, to or of·any judge, or of any decision by a judge, shall in any case be construed to be a contempt."

"Section 932.23. Said courts, in the exercise of their criminal jurisdiction, may punish for contempt as in the exercise of their civil jurisdiction, and the criminal courts of record shall possess, in this respect, the same powers as the circuit courts."

The law thus quoted has been the guide of the courts of Florida in contempt matters for more than one hundred years. This court has from its inception recognized the distinction between contempts committed outside of and those committed within its presence. Ex parte Earman, 85 Fla. 297, 95 So. 755. It has likewise recognized the distinction between civil and criminal contempts and may punish the latter without notice or rule to show cause. S. A. L. Ry. Co. v. Tampa Southern R. R. Co., 101 Fla. 468, 134 So. 529.

The early contempt cases to reach this court were brought by attachment as in England. State v. Johnson, 13 Fla. 33. In some of these cases it was held that appeals would not lie. Caro v. Maxwell, 20 Fla. 17. Later their validity was tested by habeas corpus. Ex parte Senior, Jr., 37 Fla. 1, 19 So. 652. The practice in contempt has never been regulated by statute in Florida as it is by Congress in the Federal Courts. It has been regulated by the State Courts and the regulation has been so satisfactory that the tendency of the Legislature has been to extend rather than limit the power of the courts.

The court is shown to have followed approved procedure, is not charged with being arbitrary or unfair, and offered to retire from the case if appellants felt that they would prefer to be tried by another judge, so there is no merit to the error assigned on this point. The statutory reasons disqualifying a judge to sit in a cause do not necessarily apply in contempt cases. Punishment for contempt is not for a cause personal

to the Court; if the contempt is criminal, as in this case, it is a matter of public concern and is imposed to vindicate orderly procedure. We do not find a piffle of factual basis to disqualify the judge in this case; orderly judicial procedure was the only question at stake.

In the case of In re Hayes, *supra,* this court held that publishers of newspapers have the right but no higher right than others to publish the conduct of the courts, but such right is limited by the obligation to observe respect for truth and fairness, that freedom of speech and the press contemplates the right of the public to know and discuss all judicial proceedings but this does not include the right to attempt, by wanton defamation and groundless charges of unfairness and partisanship, to degrade the tribunal and impair its efficiency, that prohibition of the abridgment of the press does not secure immunity from punishment to any citizen who falsely and with the purpose to defame, attacks in the newspapers the character of any other citizen, or impugns the integrity, honor, and authority of the courts. The Hayes case is the best reasoned case we have found on the subject and is supported by the current of State and Federal decisions throughout the country. See Dangel on Contempt, page 161, paragraph 355, where contempt is discussed at length and many cases cited. See also Sullivan, Contempt by Publication, page 18, and Rapalje, same subject where the cases are discussed at length and similar conclusion reached.

The Hayes case grew out of an editorial published in a Pensacola paper in which it was charged that in the litigation of a certain cause this court was "partisan", "stubborn", "hostile to counsel" and "ignorant", for which the editor and publisher were attached and adjudged in contempt. The court grounded its judgment squarely on the theory that the people demand a high standard of character, virtue, and intelligence in the judiciary, that there is reposed in them a high and sacred trust, controversies affecting their lives, liberty, and property and that in the adjudication of such controversies the "exhibition by the justices of ignorance, stubbornness, hostility to any party to the cause of his representatives, unfairness, partiality and partisanship would destroy the ef-

ficiency and authority of this court, bring it into contempt of the people and prepare the way for breaches of the peace and possible bloodshed among our citizens."

The charge here is that both the editorials and the cartoon were predicated on inaccurate, distorted, incomplete and biased reports of pending litigation, that the purpose and effect of the editorials and the cartoon were to impute partisanship and favor on the part of the circuit judges to those charged with crime and that such partisanship was so pronounced that they refused to heed the voice of the peoples' representatives.

Let us examine the editorials and the cartoon and assess the basis for this charge. The editorial on November 2 is in five sections; the first and second sections are in the main factual and deductive statements that are not material to the charge. The third section charges that courts sometimes go out to find every possible technicality of the law to protect the defendant, to nullify prosecution, the result being that the peoples' rights are jeopardized and the basic reason for courts stultified. The people then wonder whether their courts are being subverted into refuges for lawbreakers.

The first paragraph of the fourth section then proceeds to illustrate the charge made in the third section by charging that Judge Paul D. Barns at the behest of the defendant peremptorily sent eight indictments for rape back to the grand jury for re-presentation and re-indictment because they were not properly drawn. The facts were that when the first of the eight rape cases was called the court was confronted with a motion to quash the indictment; on consideration of the motion the prosecuting attorney agreed with the court that the indictment was defective because of failure to name the person raped and that the other seven were infected with a similar defect. The grand jury was in session and Judge Barns promptly referred all the indictments back to the grand jury by which they were reconsidered and new indictments were returned within twenty-four hours.

Paragraphs two, three, four, and five of the fourth section of the editorial of November 2 charged that a padlock case was instituted against the Brook Club (a road house of local

note) before Judge Holt but through some mysterious means, after five months, it was called up by Judge Wisehart at defendant's insistence and peremptorily dismissed; hence the defendant got delay when it wanted it and a prompt dismissal when it desired. The facts are that the Brook Club case was regularly instituted before Judge Hunt and proceeded to issue promptly and months after the issues were matured and the case ready for trial, it was set down on motion to dismiss with notice to opposing counsel. Every step in the cause was regular and the motion to dismiss was called up before Judge Wiseheart, because Judge Hunt was out of the circuit. This Court can take judicial knowledge that Judge Hunt had been called into the armed services and that Judge Barns being the senior circuit judge had a very broad discretion under the law in assigning cases to other judges.

The concluding paragraphs of Section four have to do with a suit to abate a nuisance (bookmaking at the Tepee Club) wherein Judge Holt ruled incompetent as evidence five affidavits. No other evidence was offered by the prosecution; temporary injunction was denied. The editorial then goes on to interpolate other derogatory matter and concludes by suggesting that such interpretations make the people raise questioning eyebrows and give the State's case an unequal chance with that of an accused lawbreaker.

The editorial of November 7 emphasizes that on November 2 by restating some of the groundless charges against the judges and then pyramiding deception on deception by insinuating that Judge Wisehart disposed of the Brook Club case at the will and behest of the defendant while the prosecution was engaged with the grand jury. Consequently the people "did not get in a peep." So the vice in both the editorials was the distorted, inaccurate statements of the facts and with that statement were scrambled false insinuations that amounted to unwarranted charges of partisanship and unfairness on the part of the judges.

The record was available in all these cases and it does not reveal a breath of suspicion on which to predicate partisanship and unfairness on the part of the judges. It is shown rather that they acted in good faith and handled each case

to the very best advantage possible. There was no judgment that could have been entered in any of them except the one that was entered. If the editorials had stated the facts correctly, nothing but a correct conclusion could have been deduced and there would have been no basis for contempt but here they elected to publish as truth ·a mixture of factual misstatement and omission and impose on that false insinuation, distortion, and deception and then contend that freedom of the press immunizes them from punishment.

The cartoon is, if possible, a worse perversion than the editorial. By pictograph, it emphasizes the welter of false imputation in the editorials and perverts the symbol of law and justice. Since Chief Justice Coke said to King James I, ·"The King is under God and the law," the judge has been the symbol of law and justice as familiar to the people of this country as the symbol of Uncle Sam. Speak the word "Judge" and there arises the visage of Marshall, Miller, Holmes, Brandeis, Taylor, or Whitfield, the very symbol of justice and wisdom. It is quite true that in rare instances, those who donned the silk fell below type but we have become so accustomed to associate these virtues with the "Judge" that they have become a part of our common heritage.

The symbol of the judge in the cartoon does not reflect one attribute of this well known judicial concept. He wears the bloated "beer blossom" face of the gay nineties and looks as though he had spent the night before on a jag. The symbol of the defendant fawning over the judge may typify the wishful thinking of the organized criminal gang but to one indoctrinated with respect for law and order it has more the likeness of the overlord of Pluto's kingdom. At any rate, a defendant seated on the dais by the side of and fawning over the judge is a gross slander of our method of administering justice and warrants severe censure. The symbol of a manikin representing the public imploring the court is likewise irrational and a prostitution of anything known to court room procedure.

The cartoon and the editorials assimilated, the deduction is inescapable that the circuit judges of Dade County are grabbing at technicalities to free criminals, that the voice of

the people is thrown to the discard, that trials are juggled at the behest of the criminal, that the courts are in league with the underworld and will sanction any species of sham plea to give it the breaks. We can think of no better build-up on which the cerebral plummet could fathom a state of partisanship and unfairness more libelous to the court. Appellants contend that no such interpretation was intended but the answer to this contention is that a "man reveals his mind by the symbols he adopts" and we find no reason to conclude that appellants did not adopt their symbols deliberately. The Miami Herald is one of the leading newspapers in the southeast. It has a daily circulation of 125,000 and Dade County has a population of more than 300,000. The Circuit Court of Dade County disposes of more than 7000 cases per year. The Miami Herald was engaged in what was known locally as an anti-vice crusade and he had singled out the circuit judges as aiders and abbetters in the object of its wrath. In the light of this factual recitation, it is utter folly to suggest that the object of these publications was other than to abase and destroy the efficiency of the court.

We have read Toledo Newspaper Company v. United States, 247 U. S. 402, 38 Sup. Ct. 560, 62 L. Ed. 1186; Nye v. United States, 313 U. S. 33, 61 Sup. Ct. 810, 85 L. Ed. 1172; Near v. Minnesota, ex rel. Olson, 283 U. S. 697, 51 Sup. Ct. 625, 75 L. Ed. 1357; Patterson v. Colorado, 205 U. S. 454, 27 Sup. Ct. 556, 51 L. Ed. 879, but we do not think any of them collide with the views expressed in this case. We also agree that publications about a case that is closed no matter how scandalous, are not punishable as contempt. This is the general rule but the Florida Statute is more liberal than the rule.

What has been said brings this case easily within the rule announced in the Hayes case, *supra,* on authority of which the judgment might with propriety be affirmed but appellants insist that they are immunized from the judgment imposed on them by their right of freedom of the press. They rely on Bridges v. California, 314 U. S. 252, 62 Sup. Ct. 190, 86 L. Ed. 192 to support this contention. It is also contended that the Bridges case prescribed a rule of decision by which all state

and Federal courts must be governed in imposing judgments for contempt by publication.

The Bridges case has undoubtedly created a variety of opinion as to what the law of contempt is and as to what circumstances warrant its punishment by state courts but we do not follow appellants in their interpretation of it. The provision of the Florida Constitution under which this Court proceeded in the Hayes case was not materially different from that in many other state constitutions. The provision in the First Amendment to the Federal Constitution protecting freedom of the press was a prohibition imposed on Congress and had nothing to do with the States. The Fourteenth Amendment adopted in 1868 dealt with a subject matter entirely foreign to freedom of the press but in Gitlow v. New York, 268 U. S. 625, 45 Sup. Ct. 625, 69 L. Ed. 1138, decided in 1925, the court said that the Fourteenth Amendment extended the immunity in the First Amendment to the States. So it was not until 1925 that anyone dreamed that the Federal Constitution had anything to do with the punishment for contempt under state law. In fact, Federal holdings supported this belief. Prudential Insurance Co. v. Cheek, 259 U. S. 530, 42 Sup. Ct. 516, 66 L. Ed. 1044. The States has been exercising the power to publish for contempt for more than a hundred years and we find nothing in the Bridges case indicating a purpose to supersede state law and decisions on the question or to require state courts to conform to Federal pattern.

The majority opinion in the Bridges case appears to have been predicated on the doctrine of the concurring opinion of Mr. Justice BRANDEIS in Whitney v. California, 274 U. S. 357, 47 Sup. Ct. 651, 71 L. Ed. 1095. The Court was then concerned with free speech and assembly rather than freedom of the press and the gist of the holding was that in order to support a fiinding of "clear and present danger," it must be shown either that immediate serious violence was to be expected or was advocated or that past conduct furnished reason to believe that such advocacy was then contemplated.

The "clear and present danger cases" had their inception in Schenck v. U. S. 249 U. S. 47, 39 Sup. Ct. 247, 36 L. Ed. 470,

wherein Mr. Justice Holmes couched the doctrine in these words, "the question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that 'The State' has a right to prevent." In the Bridges case, the Court says that the "substantive evil likely to result must be extremely serious and the degree of imminence extremely high before utterances can be published" and that free press "must be given the broadest scope that can be countenanced in an orderly society."

So given its broadest scope, we cannot say that the Bridges case did more than decide the law of that case. We think the rule still persists that each case must stand or fall by the facts presented. All the cases and text books uphold this doctrine. In the Bridges case, the Court in terms recognized that California had no law punishing "publications made outside the court room" as contemptuous while in the case at bar, as previously pointed out, every step was taken under the statute, recognized for more than one hundred years. There being no law in California regulating the subject matter, the Supreme Court was relegated to the facts presented on which it determined the case and held that they would not support the judgment.

Prior to the adoption of the Fourteenth Amendment, there was no theory upon which Federal courts could interfere with the states in defining and punishing abuses of freedom of the press. The only condition imposed on the state's power by the Fourteenth Amendment is the observance of due process; in other words, the judgment or the statute assaulted must be arbitrary, unreasonable, or discriminatory. It necessarily follows that the only question that can properly be raised here goes to the reasonableness, arbitrariness, or the discriminatory character of the contempt judgment of the Florida law under which it was imposed. This question appellants have by-passed and have elected to stand on their immunity from punishment under the Fourteenth Amendment.

If appellant's theory that the judgment appealed from

abridges their liberty of the press as guaranteed by the First and Fourteenth Amendments to the Federal Constitution is pursued to its ultimate conclusion, it necessarily follows that the power of the States in the premises is abrogated. We do not think the Bridges case is susceptible to that interpretation. We think that the reservations to the states in the Tenth Amendment are still vital, that State Courts still have the power when properly authorized to punish for contempt and if not unreasonably or arbitrarily exercised, their judgments will be upheld. We have examined the editorials and the telegram involved in the Bridges case and we find nothing in them assaulting the integrity of the court. They would not have been contemptuous under the rule in the Hayes case.

We have examined the case of People of the Virgin Islands v. Canute Brodhurst, Sr., U. S. Circuit Court of Appeals, Third Circuit, decided March 21, 1945, which is also relied on by appellants but we do not think it rules this case. It was disposed of on the theory that the provisions of the St. Croix Code relied on were repealed by what was known locally as the organic act and being so the Court was without authority to impose the judgment for contempt.

We think the cases generally hold that while the abridgment of freedom of the press is the exception and that while it cannot be done on grounds as tenuous as those which authorize the regulation of a public utility or a corporation for profit, it may be done to "prevent grave and immediate danger to interests which the State may lawfully protect." West Virginia State Board of Education v. Barnett, 319 U. S. 624, 63 Sup. Ct. 1178, 87 L. Ed. 628; Herndon v. Lowry, 301 U. S. 242, 57 Sup. Ct. 732, 81 L. Ed. 1066; Thornhill ve. State of Alabama, 310 U. S. 88, 60 Sup. Ct. 736, 84 L. Ed. 1093. Certainly the courts are interests which the state may lawfully protect. It is not to be inferred that courts are in any sense immunized from criticism. A newspaper may criticize, harass, irritate, or vent its spleen against a person who holds the office of judge in the same manner that it does a member of the Legislature and other elective officers, but it may not publish scurrilous or libelous criticism of a presiding judge as such, or of his judgments for the purpose of discrediting

the court in the eyes of the public. Respect for courts is not inspired by shielding them from criticism. This is a responsibility of the judge, acquired over the years by the spirit in which he approaches the judicial process, his ability to humanize the law and square it with reason, the level of his thinking, the consistency of his adherence to right and justice, and the degree to which he holds himself aloof from blocs, groups, and techniques that would sacrifice justice for expediency.

Freedom of the press is not a symbol of the "big stick" that one may flourish with impunity. It is one of the vital elements of democracy in which the public as well as the proprietor has a vital interest. In all the categories of our economic structure, the newspaper business is the only business earmarked in the Constitution. It is not out of place to ask why the newspaper business should enjoy a solicitude not accorded the grocery business, the dry goods business, the restaurant business, the drug business, and scores of other businesses by which men and women shoo the wolf from the door. The newspaper business is subject to the ordinary forms of taxation but it may successfully resist undue taxes and regulations. Other businesses do not enjoy the latter protection. Grosjean et al., v. American Press Co. 297 U. S. 233, 56 Sup. Ct. 444, 80 L. Ed. 660.

The answer to this question is not to seek. Our forefathers were committed to the doctrine that democratic processes could not survive, absent a public opinion energized by truth, liberty, equality, and justice. Hence the reason for a free and untrammeled press as a medium to generate such a type of public opinion. It therefore follows that while the Bill of Rights endowed the press with liberty, it also imposed on it a trusteeship that it may not abandon or prostitute in the exercise of its freedom. The propagation of falsehood and deception in the manner shown in this case amounts to a deliberate abandonment of its trusteeship on the part of the press. It would be equally so to permit itself to become the tool of any set or clique for the purpose. Courts cannot function in a free country when the atmosphere is charged with the effusions of a press designed to poison the mind of

the public against the presiding judge rather than to clarify the issues and propagate the truth about them... The latter was the press that Mr. Jefferson visioned when he promulgated the thesis, "Our liberty depends on the freedom of the press and that cannot be limited without being lost."

Judge Cooley characterized a free press as any discussion of public matters essential to prepare the people for an intelligent exercise of their rights and duty as citizens. So when we speak of a free press, we think of gathering and disseminating news, the editorial page, or any discussion to promote truth and understanding. Unless it bears some relation to the promotion of truth and understanding, free press may not include the comics, sports, commercial advertisements, and other features that have become part of the modern newspaper. A free press never was contemplated to be a subsidized press open solely to the stockholders or others for a price. In fact, a press with one eye on dividends and the other on hedges to truth and understanding is not a free press as contemplated by the Constitution. The hallmark of a free press is voluntary devotion to the common good; when other motives are dominant, it usually ceases to be free and forfeits public confidence.

It would be trite to contend that important constitutional guaranties are burdened with commensurate duties and responsibilities. It would be just as trite to contend that a free press is one of the essentials of representative democracy and that it pays its debt to the bill of rights in proportion to the effort it puts out to enlighten public opinion and square it with democratic processes. It may also be confidently asserted that a free press is no freer than a free man, the one being as securely bound by approved canons of decency and propriety as the other. Neither is free to do as it will in total disregard of the right of others. The courts have ample power to relieve against encroachments on liberty of the press and to see that all, not merely the elect, have a right to publish their views. It is commendable in a newspaper to condemn public wrongs and outmoded systems of presiding, to expose vice and corruption or the conduct of public officials who veer from the course charted for them by the law. Bear-

ing these common sense principles in mind, there is no limit to the content or the diversity of information that the press may exhibit to the public. The fact that it derives from antagonistic sources is all the better, since that enables the public mind to evaluate and arrive at a better balanced judgment. Freedom to publish one's views is a principle of universal practice, but when the press deliberately abandons the proprieties and sets out to poison its pablum or to sow dragons' teeth and dispense canards for the purpose of doing another a wrong, it is in no different category from a free man that does likewise. The most rigid safeguard thrown around a free press would not protect appellants from falsely publishing or announcing to the world that the clergy of Miami were in sympathy with the practice of polygamy or were fostering other doctrines equally obnoxious to approved moral standards.

There is another constitutional guaranty equally as binding as freedom of the press. We have reference to fair and impartial trial guaranteed by Article Six, Federal Constitution, and Section Eleven, Declaration of Rights, Florida Constitution. Freedom of the press cannot be exploited in a manner to destroy fair and impartial trial. There is of course an area in which a pending trial may be discussed as "news" and information considering it given to the public, but when press reports of a trial are turned into assaults on the character of integrity of the presiding judge, the jury, or the witnesses, they degenerate into trial by newspaper (often called contempt by publication) and merit condemnation. Bee Publishing Company v. State, 107 Neb. 74, 185 N. W. 339. Under the English practice, trial by newspaper is punished speedily but wanton criticism of the court is rarely taken account of. The result is that trial by newspaper is practically obsolete in England while in this country, it has in some instances become one of the most vicious impediments to fair and impartial trial.

The theory of our system of fair trial is that the determination of every case should be induced solely by evidence and argument in open court and the law applicable thereto and not by any outside influence, whether of private talk or

public print. Patterson v. Colorado, 205 U. S. 454, 27 Sup. Ct. 556, 51 L. Ed. 879. In Sullivan on Contempt by Publication, page 180, it is pointed out that trial by newspaper in its subtlety, insidiousness, and positive damage, exceeds all injuries to the judicial processes. To assert that the administration of justice is not thwarted and that a "judge of ordinary fortitude" is not disturbed or perhaps thrown off the beam by assaults of the character shown here, assumes a trend in the mass mind that common experience knows nothing about. Partisan assaults on judges, juries, or witnesses are not within the compass of a free press so long as the case is pending.

We have searched the text books and the cases diligently and we find nothing to support the contention of one of counsel for appellants that freedom of the press protects him if he chooses to lie about the court and that the court can do nothing about it unless he lies in the courtroom or his lying is "manifested with such a high degree of imminence as to express a high degree of threat." How imminent the "threat" must be under such a test we do not know and do not labor the point because we are convinced that it is beside the question. The main purpose of contempt under state law is to afford the court a means to enforce decorum and punish wilful disregard of orderly judicial administration. The State Courts touch the public much more frequently than the Federal Courts and they have many reasons to enforce orderly administration that would not arise in the Federal Courts. If that power is to be construed by what appellants contend to be the pattern in the Bridges and Nye cases, then more than one hundred years of state law and decisions on the subject are turned into confusion or set at naught. See Dangel on Contempt, page 161, et seq., for cases and discussion illustrating the scope of state decision on the subject.

We do not think this can be the law. The Bridges case was disposed of on authority of the "clear and present danger cases," which are not analogous to most of the state cases because they arise from a different state of the law. The ultimate test in the Bridges case requires that the "substantive evil must be extremely serious and the degree of

imminence extremely high before the utterances can be punished." Even if this test is to the rule in the State Courts, they are authorized to apply it by their own law and standards and unless the application is shown to be arbitrary and unreasonable, their judgment should not be disturbed. The law in Florida permits the most liberal exercise possible of freedom of the press but holds to account those who abuse it.

We therefore hold that the cartoon and the editorials afford ample support for the judgment imposed and that the issues were properly adjudicated under Florida law. We do not think that the rule in the Bridges case is applicable but if for any reason it may be held to be, the judgment is still free from error because it is not charged that it was applied in an arbitrary or unreasonable manner and if it were, there is no showing to that effect. We do not think freedom of the press can be exercised in a way to vitiate fair and impartial trial nor do we think that it can be employed to harass the court or in total disregard of approved standards of propriety when the rights of others to the cause are adversely affected.

Affirmed.

CHAPMAN, C. J., BROWN, THOMAS and ADAMS, JJ., concur.

BUFORD and SEBRING, JJ., dissent.

BUFORD, J., dissenting:

I find myself unable to concur in the conclusion reached by the majority of this Court affirming the judgment of contempt. I agree with much of what it said in the very able opinion prepared by Mr. Justice TERRELL and I think it would be very easy to follow that opinion in the main and arrive at an opposite conclusion.

As I read the editorials and view the cartoon constituing the basis of the charge, there is nothing in either which imputes a want of fairness, impartiality or integrity to any Judge or any Court. Nor do they appear to have for their purpose or intent the influencing or controlling the determination of the result in any particular case then pending in any court. They appear to adversely criticize a judicial system

which, to protect the rights of the righteous must, by the same token, see that the alleged rights of the unrighteous are determined.

We who constitute this Court find ourselves often in the position where we must, to preserve the right of the innocent, reverse the conviction of one who is shown to be guilty, but whose conviction has been had in whole or in part by illegal means. This follows from the recognition of the wisdom of our judicial system. If there be those who think it a bad system they have the right to express their views and, if possible, to get so many converts to their way of thinking that the system may be changed by organic law.

However, aside from this conclusion, we are faced with two opinions, one of the Supreme Court of the United States and one of the Supreme Court of Louisiana, which I am convinced require the reversal of the judgment here. I refer to the opinions and judgments in the cases of Bridges v. California, 314 U. S. 252, 62 Sup. Ct. Rep. 190, 86 L. Ed. 192, and Graham v. Jones in Re Times Picayune Publishing Co., 200 La. 137, 7 So. (2nd) 688. Of course, I recognize that the latter case is only persuasive but I think the Bridges case is binding and that in the absence of showing of *clear* and *present danger* of influencing or controlling the determination in any particular case, then pending in any court, created by the publication complained of, no punishable contempt is made to appear.

SEBRING, J., concurs in conclusion.

SEBRING, J.:

I concur in the conclusion reached that the judgment appealed from must be reversed on authority of Bridges v. California, 314 U. S. 252, 62 S. Ct. Rep. 190, 86 L. Ed. 192.