635 So.2d 1238 (1994)
Bettye COLEMAN, et al., Plaintiffs-Appellees,
v.
CADDO PARISH SCHOOL BOARD and Committee on the Status of Women, Defendant/Intervenor-Appellants.
Bettye COLEMAN, et al., Respondents,
v.
Judy D. BOYKIN, Applicant.
Bettye COLEMAN, et al., Respondents,
v.
CADDO PARISH SCHOOL BOARD, Applicant.
Nos. 25617-CA, 25925-CW and 25931-CW.
Court of Appeal of Louisiana, Second Circuit.
March 31, 1994.
Order Granting Rehearing in Part May 2, 1994.
*1245 Davidson, Nix, Arceneaux, Jones & Askew by Allison Jones, Shreveport, for Bettye Coleman, et al.
Beard & Sutherland by Roy L. Beard and Fred H. Sutherland, Shreveport, for Caddo Parish School Bd.
Pugh, Pugh & Pugh by Robert G. Pugh, Shreveport, for Committee on the Status of Women.
Peatross, Greer & Frazier by L. Edwin Greer, Shreveport, for Judy D. Boykin.
Before MARVIN, C.J., and NORRIS and HIGHTOWER, JJ.
MARVIN, Chief Judge.
In this appeal of the judgment in what has become popularly known as the Caddo sex education case, we amend in some particulars and recast to make specific, the judgment granting declaratory and injunctive relief, effectively affirming, in large part, the result in the trial court.
Exercising our supervisory jurisdiction on the respective applications of the school board and its president, Ms. Boykin, we consolidated with the appeal a writ of review in each instance to review the trial court's finding each applicant in contempt of court for their respective conduct after the trial court rendered its judgment in the case.
While amending and recasting to effectively affirm, in large part, the trial court's judgment in the appeal of the sex education case, we reverse the contempt judgments.

PREFACE
Plaintiffs, a group of Caddo Parish parents whose children attend the public schools operated by the defendant Board, instituted the action, contending that numerous written passages of varying length in the sex education curricula adopted by the Board violated LRS 17:281. The publisher of the curricula intervened in the action, joining the Board as a defendant and as an appellant in this appeal. Except where necessary to distinguish the appellants, we shall refer to appellants simply as the Board.
The trial court found that many of the challenged passages complained of violated the statute, while others did not. This appeal presents only statutory and not constitutional issues: whether a particular passage either
(1) includes religious beliefs, practices in human sexuality, or subjective moral and ethical judgments of the instructor or other persons;
(2) does not contain factually accurate biological or pathological information on a permissible subject;
(3) counsels or advocates abortion; or
(4) quizzes, surveys, or tests students about personal or family beliefs or practices in sex, morality or religion.
*1246 These issues, of course, are framed in the language of the statute, which was initially adopted by the 1979 legislature, but which has been since amended by six other legislatures, none of which has further defined the words or terms in the legislation's mandates and prohibitions. We shall later quote the pertinent language of the statute in discussing the passages the trial court found to have violated the statute. Plaintiffs have not appealed or otherwise complained of the trial court's ruling that found some challenged passages did not violate the statute. Those passages are not before us.
Because of its mandates and prohibitions [shalls and shall nots], the statute, in short, defines sex education and states what may and may not be included in the curriculum.
The statute does not delegate unlimited legislative authority to school boards. The Board, of course, is implicitly authorized to assess the educational merit of sex education curricula and select one or more to be taught in its schools. Recognition of this authority does not shield, however, the selected curriculum from judicial scrutiny when the curriculum is alleged to violate in some particulars a specific part of the statute. The judiciary is constitutionally burdened with this responsibility in each case where an action alleges that conduct of a person, natural or juridical, violates a statute.
Here, the trial court had the initial responsibility of determining whether the language of the two curricula in question was contrary to the language of the statute [What does the language of each mean?]. As an appellate court, we determine whether the trial court was clearly wrong in its factual determinations or in its legal conclusions.
In its assignments of error, the Board contends the trial court used an improper legal standard to "review" the written passages that were challenged and that the judgment enjoining the Board is too broad.
We agree that the judgment enjoining the Board technically violates the specificity requirement of CCP Art. 3605, notwithstanding the trial court's more specific reasons that were later given for denying the Board's motion to recall the injunction on the grounds of lack of specificity. Compare Brown v. East Baton Rouge Parish School Bd., 405 So.2d 1148 (La.App. 1st Cir.1981). Agreeing with plaintiffs, however, that this issue may be resolved by our recasting the judgment, as here amended, we shall "cure" the specificity violation.
For the reasons we assign in the last section of this opinion, we do not agree with the Board's assertion that the trial court employed an erroneous legal standard of review in determining that some passages in the curricula violate the statute. Also to avoid burdening readers other than the litigants and their counsel, we resolve the assignments of error that relate to the passages the trial court found to be in violation of the statute before we discuss the Board's assignments relating to the trial court's rulings on evidentiary matters.
The statute, LRS 17:281, initially enacted in 1979 with seven subsections, A through G, has since been amended or supplemented in part by seven acts adopted by the legislature[s] in 1982, 1987, 1988, 1990, 1992, and 1993. The statute now contains four subparts of the § 281 A subsection and includes an additional subsection H. Pertinent to this litigation are subsection F and subparts (2) and (3) of subsection A.
The curricula before us are: Sex Respect: The Option of True Sexual Freedom, for use in the 7th and 8th grades, and Facing Reality: A New Approach to the Real World of Today's Teen, for use in the 10th grade. Each curriculum includes at least two publications, a text for students and a guide for either or both the teacher and parents. These publications total 482 pages, Sex Respect, 232 total pages and Facing Reality, 250 total pages. The Board asserted in the trial court that the student texts alone should be scrutinized for statutory violations, but does not complain on appeal of the trial court's ruling that the teacher and parent *1247 guides must also comply with the statute because the guides direct what and how the students are taught.

THE STATUTE
LRS 17:281 provides that public elementary and secondary schools may, but are not required to, offer sex education instruction in grades seven and higher, provided the instruction is offered as part of an existing course such as biology, science, physical hygiene or physical education. A child may be excused from such instruction at the option of his or her parent or guardian.
We emphasize the language of the statute in subsections A(2), A(3) and F that is pertinent:
A(2). It is the intent of the legislature that, for the purposes of this Section, "sex education" shall mean the dissemination of factual biological or pathological information that is related to the human reproduction system and may include the study of sexually transmitted disease, pregnancy, childbirth, puberty, menstruation, and menopause, as well as the dissemination of factual information about parental responsibilities under the child support laws of the state. However, the dissemination of factual information about parental responsibilities under the child support laws of the state may be offered only in grade nine or above. It is the intent of the legislature that "sex education" shall not include religious beliefs, practices in human sexuality, nor the subjective moral and ethical judgments of the instructor or other persons. Students shall not be tested, quizzed, or surveyed about their personal or family beliefs or practices in sex, morality, or religion.

A(3). ... The major emphasis of any sex education instruction offered in the public schools of the state shall be to encourage sexual abstinence between unmarried persons.

F. No program offering sex education instruction shall in any way counsel or advocate abortion.

Before trial, plaintiffs identified the written passages claimed to have violated the statute, using a letter designation to identify the specific statutory basis for the violation:
"R"Includes religious beliefs, practices in human sexuality, or the subjective moral and ethical judgments of the instructor or other persons;
"M"Does not contain factual biological or pathological information related to the human reproduction system or the study of sexually transmitted disease, pregnancy and childbirth, and is thereby medically inaccurate;
"A"Counsels students on the subject of abortion;
"Q"Quizzes, surveys or tests students about their personal or family beliefs or practices in sex, morality or religion.

THE EVIDENCE
The case was tried on stipulations, documentary evidence and expert testimony. No lay witnesses testified.
Plaintiffs' four experts were Rabbi Michael Matuson, an expert in religion and theology, and three M.D.'s: Dr. Joseph Bocchini, a pediatrician specializing in infectious diseases; Dr. Warren Otterson, an obstetrician/gynecologist; and Dr. George Seiden, a psychiatrist. Each M.D. was accepted as an expert in biological and pathological information regarding human reproduction. Dr. Bocchini's expertise also included sexually transmitted diseases.
The Board's three experts were an M.D., Dr. William R. Archer, III, in obstetrics, gynecology and public health, and two Ph. D.'s, Dr. William R. Coulson, in counseling psychology, clinical psychology and philosophy, and Dr. Frederick R. Carney, in religious and secular ethics.

STATUTORY CONSTRUCTION
The statute's language [mandates and prohibitions] does not define the terms such as "religious beliefs," "subjective moral and ethical *1248 judgments" and "personal or family beliefs or practices in sex, morality, or religion." The expert witnesses differed as to whether the curricula contain such beliefs or judgments, but neither the experts nor the trial court suggested the words or phrases at issue had acquired a definitive technical meaning.
The Board contends the trial court interpreted the restrictive language in the statute too broadly, such as by finding that a passage includes a religious belief simply because it contains such words as spiritual that have a religious origin or that may, in some context, be used to express a religious belief. The Board notes that many of the challenged passages contain words that may have either a religious or a secular meaning, depending on the context in which they are used. Contending that the trial court should have given great deference to the School Board's decision to adopt these curricula, the Board effectively argues that no statutory violation should be found unless the language at issue cannot be reasonably construed as having a secular meaning in the context in which it is used in the curricula. A similar argument is made by the Board about the trial court's "expansive" construction of other parts of the statute.
The statutory language at issue is not alleged, or found, to be ambiguous. The language must therefore be given a genuine construction in accordance with the fair import of the words used, taken in their usual sense, and considering their context. LRS 1:3; State Dept. of Social Services v. Parker, 595 So.2d 815 (La.App.2d Cir.1992). Courts may not disregard the clear wording of a statute under the pretext of pursuing its spirit. LRS 1:4; Jungina v. Stafford, 535 So.2d 794 (La.App.2d Cir.1988).
Neither the express wording of the statute, nor the allocation of authority between the legislature and the school board in these circumstances, which we discuss in detail below, suggests or requires that the statute be strictly or narrowly construed in favor of either litigant. The Board cites no other authority for its argument that the statutory restrictions should be narrowly construed to allow the school board to exercise its discretion and judgment with little or no interference from the courts. The proper standard of statutory construction, then, is a fair and reasonable construction in light of the statute's purpose. J.M. Brown Const. Co. v. D & M Mechanical Con., Inc., 275 So.2d 401 (La.1973).
Noting that the statute requires the "major emphasis" of any sex education instruction to be abstinence before marriage (§ 281 A(3)), the Board argues that many of the passages found in violation encourage abstinence and therefore comply with, rather than violate, the statute. This argument overlooks the other specific statutory provisions limiting the content of sex education curricula. We must presume that every provision in the statute was intended to serve some useful purpose and will consider the entirety of the statute to discern its purpose and the specific meaning of its words and phrases. See Legros v. Conner, 212 So.2d 177 (La.App. 3d Cir.1968).
A fair reading of the statute, taken as a whole, shows that the legislature intended to allow sex education instruction in certain grade levels in the public schools, for the dual purposes of educating students about the human reproduction system, including such topics as pregnancy and sexually transmitted diseases, and of encouraging students to abstain from sex before marriage, by the use of factually accurate biological and pathological information, and without the use of religious beliefs, subjective moral and ethical judgments, or quizzing on personal or family beliefs or practices in sex, morality or religion, notwithstanding that such beliefs or judgments may be held by a great majority of people and may be quite effective in promoting abstinence.
In a footnote in its brief, the Board cites to us the 1993 amendment to § 281, which became effective after the trial court's decision was rendered. Acts 1993, No. 921, effective *1249 June 25, 1993. The amendment moved the statement about emphasizing abstinence before marriage from subsection A(3) to subsection A(4), and lengthened the statement to read:
A(4). The major emphasis of any sex education instruction offered in the public schools of this state shall be to encourage sexual abstinence between unmarried persons and any such instruction shall:
(a) Emphasize abstinence from sexual activity outside of marriage as the expected standard for all school-age children.
(b) Emphasize that abstinence from sexual activity is a way to avoid unwanted pregnancy, sexually transmitted diseases, including acquired immune deficiency syndrome, and other associated health problems.
(c) Emphasize that each student has the power to control personal behavior and to [sic] encourage students to base action on reasoning, self-esteem, and respect for others.
The Board urges us to apply the 1993 amendment retroactively, suggesting that it "clarifies the expressed intent of the legislat[ure] to establish a standard of conduct and direction for all `school-age' children." We agree that an appellate court may sometimes consider and apply on appeal some legislative amendments that were not in effect when a trial court's judgment was rendered. See McNamara v. Bayou State Oil Corp., 589 So.2d 1099, 1108 (La.App.2d Cir. 1991), writ denied.
In our view, the 1993 amendment does not appreciably change the meaning of the statute as a whole. It does not change subsection A(2) of the statute, which contains the statutory definition of "sex education" and the prohibitions against "quizzing" and against including religious beliefs or subjective moral and ethical judgments in sex education instruction. Those provisions remain, notwithstanding that the 1993 legislature directs a sex education curriculum to additionally emphasize that each student has the power to control personal behavior and to encourage students to base their action on reasoning, self-esteem and respect for others.
Plaintiffs have not challenged, as violative of the statute, many passages in the curricula which encourage students to make their own choices about sex and to base their choices on reasoning, self-esteem and respect for others, without making reference to religious beliefs or subjective moral and ethical judgments. Examples are: "The best birth control is self-control. ... Developing a good self-concept helps us make more responsible decisions. ... Looking at the risks involved in pre-marital sex gives us plenty of reason to avoid intercourse outside of marriage ... [A]bstinence gives us freedom ... to make choices about our lives that might not be open to us if we're preoccupied with sexual activity."
Several of the passages that plaintiffs challenged as including religious beliefs or subjective moral and ethical judgments were found not to violate the statute. Examples are:
As human beings, we gain confidence by doing what is right according to the laws of nature. Natural law is the basis of good health, as has been discovered in many other areas of modern medicine. SEX RESPECT uses the natural law of respect for one another and the power of our human sexuality to address the health problems we face today, without teaching absolute morals.
For many American families, the most abiding reasons in the struggle to practice self-mastery are religious ones. It is very important that you, as a parent, pass on your religious beliefs to your teen. They may choose to reject some of them. They may choose to embrace them. As part of their heritage, though, it could be said they have a right to be familiar with them. Remember, others will not be shy about proselytizing your teen.
The trial court found that the first passage "does not clearly include religious beliefs or *1250 subjective moral judgment. To conclude otherwise would be to read more into the passage than is present." About the second passage, the court said, "Because of the generality of these [statements], it cannot be said that they include religious beliefs or subjective moral judgments."
The trial court's analysis thus allows statements encouraging individual behavior choices based on reasoning, self-esteem and respect for others to remain in the curricula, provided the statements do not include religious beliefs or subjective moral and ethical judgments. The trial court's analysis is correct, under either the pre- or post-1993 wording of the statute.
Several of the passages that the trial court found violative of the statute state or imply that abstinence before marriage is the expected standard of behavior for everyone, adults as well as adolescents. Application of the more limited 1993 language that abstinence before marriage is the expected standard "for all school-age children" would only bolster the trial court's conclusion that the expected standard for all, adults and school-age children, is a violation of the statute, a result that the Board would not desire if we applied the 1993 expected standards. Plaintiffs do not ask that we apply the amended language. Whether or not the 1993 language is considered does not change our opinion on this record.

STATUTORY VIOLATIONS
The Board challenges each trial court finding that a passage violates the statute. Plaintiffs ask that the court's findings be affirmed in all respects. We shall summarize and address the respective arguments under each part of the statute as to violations found below.

Religious Beliefs or Subjective Moral and Ethical Judgments
The gist of plaintiffs' objection to the passages challenged in the trial court as including religious beliefs or subjective moral and ethical judgments is that they "teach as fact that there is a `spiritual' dimension to human sexuality which should be reserved solely for the matrimonial bedroom and [that] it is `immoral' for anyone, including adults, to engage in sex outside of marriage." Plaintiffs apparently agree with the overall message of the curricula, that students should abstain from sex before marriage, but object to passages where that message is conveyed by referring to religious, moral or ethical beliefs that some, but not all, persons accept as statements of fact. Examples of passages objected to by plaintiffs are:
Spiritual values are an important aspect of human sexuality.
The spiritual consequences of promiscuity are seldom addressed by [other sex education] curricula.
Sexual intercourse is designed ... to renew marriage vows and bind a couple that is united for life.
One 42 year old woman with three children made the following statement to her teenage daughter: "I had sex before marriage. Even though I knew it was wrong, I tried to make myself think it was right because we were engaged. That didn't help. The guilt still haunts me every time I have sex now, and I've been married over 20 years."
The use of contraceptive technology does not make teen sexual activity safe, moral or even legal.
The Board contends that the references to "spiritual" matters are entirely secular and that the passages discussing the moral aspects of premarital sex are expressions of an objective, rather than a subjective, standard of morality because the statute requires that sex education instruction have as its major emphasis the encouragement of sexual abstinence between unmarried persons.
Neither the wording of the statute nor the testimony of the Board's experts, taken as a whole, supports the "objective morality" argument. The statute cannot be found to prohibit instruction about choices other than abstinence simply because it directs that the "major emphasis" be placed on abstinence. *1251 Other choices, minor ones, may be offered or considered. The legislature implicitly recognized that the choice is ultimately the individual's and that abstinence, emphatically the legislature's primary choice, is not the sole choice for adolescents to make.
Even the Board's experts did not agree that abstinence before marriage is an "objective moral standard" for teenagers. Dr. Coulson, the Board's expert in clinical psychology and philosophy, testified that he has often spoken to groups of parents across the country and asked them
Is there anybody here tonight who wants your children to be having sex with one another? And nobody has ever raised their hands. ... Fortunately on this thing we agree, that children should not be having sex before marriage. That's ... the closest thing to objective morality ... that we have. (Our emphasis.)
Dr. Coulson's view was not shared by Dr. Carney, another Board expert, whose expertise included both religious and secular ethics. Dr. Carney was questioned by the trial court about "objective morality":
Q. ... The decision of a teenager to have premarital sex, do you think that decision can be one or all of these, a religious decision, a moral decision, a physiological decision, any other decisions?
A. With any particular teenager it can be any one or more of those or none of those.
Q. To classify that decision as right or wrong, is that ... a moral judgment ...?
A. One must raise the question as to whether you're talking about individual morality [which is subjective] or social morality [which is objective]. At our time in this society now, there is no generally accepted standard about teenage sex. ... At the time of my birth [1924] and early childhood, there did exist a moral standard... of society that said that teenage sex was immoral on just empirical grounds. I can't claim that that judgment is a social judgment at this time just on empirical grounds.
(Our emphasis and brackets.)
The parent/teacher guide to Facing Reality candidly states, "Some of the main questions raised by this book are moral ones," and asks, "Is it moral for your sons and daughters to engage in sexual activity before marriage?" These passages clearly show the intent of the curriculum to present its message in moral terms. The Board does not deny that this is the intent of both curricula, but broadly urges that the moral judgments expressed are objective, rather than subjective, and are therefore not prohibited by the statute. Even though we may agree with the moral standard that is stated, neither our agreement nor the record allows us or the trial court to declare a "generally accepted objective moral standard about teenage sex." The Board's Dr. Carney said there is none. Plaintiffs' experts effectively agreed. The trial court's findings that the challenged passages stating and soliciting the moral aspects of premarital sex, explicitly or implicitly, violate the statute, are not clearly wrong. We shall quote each passage in our decree.
The trial court's findings that the passages which define sexual intercourse as an action designed to be performed only by married persons include religious beliefs or subjective moral and ethical judgments are also not clearly wrong. While many of us in the current population may believe this to be true, whether on religious, moral or ethical grounds, we must recognize the expert testimony accepted below that some people do not. The passages that state subjective beliefs about sexual intercourse as factual truths, in violation of the statute, will be fully quoted in our recast of the judgment.
Many of the passages challenged by plaintiffs, as indicated, refer to the "spiritual" aspects of sexuality. Plaintiffs' religious and theological expert, Rabbi Matuson, opined that these passages include religious beliefs, while the Board's expert in religious and secular ethics, Dr. Carney, opined that most passages use the terms "spiritual" or "spiritually" in a secular context and that a few use the terms with a religious meaning but in *1252 a way appropriate for a secular text. Before discussing the trial court's assessment of the expert testimony, we review the definitions of the terms "spiritual" and "spiritually" that appear in Sex Respect.
Sex Respect asks students, "What does it mean to be mature? Emotionally, Mentally, Socially, Spiritually." The suggested answer in the teacher's guide, with respect to spiritual maturity, is:
Accepting things you can't change but willing to work hard to change what you can, putting others first, taking time to consider the deeper meaning of life, setting goals that put faith in a greater power or principle than oneself.
The student text then asks, "What can you do to help yourself mature in each way? Emotionally, Mentally, Socially, Spiritually." The suggested answer for achieving spiritual maturity is:
Attend worship services regularly, seek out friends who have strong moral values, develop a love for other people and a hunger for truth.
Rabbi Matuson opined that these passages, by including references to "faith in a greater power or principle than oneself" and regularly attending "worship services," clearly include religious beliefs and practices as an integral part of "spiritual maturity." Rabbi Matuson opined that a similar meaning of the word "spiritual" was intended in other parts of Sex Respect, such as those referring to spiritual values as an important part of sexuality and to the "spiritual parts of our sexuality." Rabbi Matuson attributed the same meaning to the term "spiritual" in Facing Reality, which refers to the "spiritual consequences" of promiscuity, although that curriculum does not expressly define spiritual consequences.
Dr. Carney conceded that the passage in Sex Respect that refers to attending worship services regularly "has a religious function," but opined that the passage was appropriate for a secular text because the conduct is merely suggested for, but not required of, students, and is one of many examples of conduct that will foster maturity of the four types listed.
Dr. Carney did not construe the reference to a "greater power" as having a religious meaning, explaining that some atheists believe in a power or a principle greater than themselves, such as the importance of "doing good" or "doing justice." Dr. Carney ascribed a religious, but secularly permissible, function to the statement in Sex Respect that "spiritual values are an important aspect of human sexuality," but opined that all other uses of the term "spiritual" in both curricula were strictly secular.
The experts gave similar disparate testimony about the meaning of passages in the curricula stating that human reproduction has a "higher meaning" than animal reproduction and that people "are more than a higher kind of animal" because they have, and animals lack, "mental and spiritual parts in their make-up." In Rabbi Matuson's view, these passages express the religious belief that man, unlike the other animals, was created in God's image. Dr. Carney acknowledged that some people might interpret these passages as including a religious belief, but stated that he does not. Dr. Carney interpreted the reference to man's "mental and spiritual parts" to mean, respectively, intellectual qualities (mental) and "qualities... such as truthfulness, a kind of person who keeps promises[,] is concerned for the welfare of others [and] is interested in doing justice" (spiritual).
The experts also gave conflicting testimony about this passage in Sex Respect:
Well, no one can deny that nature is making some kind of a comment on sexual behavior through the AIDS and herpes epidemics.
Rabbi Matuson opined that the word "nature" was used as a substitute for the word "God," explaining that, in his view, "Nature makes no comment besides what God commands it to do." Dr. Carney opined that the statement is a metaphorical rather than a *1253 literal description of nature sending a message and said, "It can do that with regard to sexual disease without ... requiring the belief that this is a surrogate for God."
After summarizing the conflicting testimony of Rabbi Matuson and Dr. Carney about the passages that use the terms "spiritual," "higher meaning," and "nature ... making some kind of a comment," the trial court stated:
Rabbi Matuson testified, and this court agrees, that these passages in this context reference religious beliefs and are not utilized in a secular meaning or connotation. As such, these passages include religious beliefs or subjective moral judgments.
The Board argues that the court simply adopted Rabbi Matuson's opinions without considering each passage in its proper context. This argument overlooks, however, the trial court's finding that "these passages in this context" violate the statute, and the fact that the court found no statutory violation in other specific passages that were challenged, notwithstanding Rabbi Matuson's opinion that those specific passages also included religious beliefs. See, for example, the passages quoted above under Statutory Construction, which refer to "natural law" and "religious beliefs." The trial court found that language was too general to constitute a violation of the statute.
This record shows that the trial court exercised its prerogative to assess conflicting expert testimony in light of the experts' qualifications, the bases for their differing opinions, and the record as a whole in interpreting the statute. Bolton v. Louisiana St. U. Med. Center, 601 So.2d 677 (La.App.2d Cir. 1992); Tyler v. Richardson, 476 So.2d 899 (La.App.2d Cir.1985), writ denied.
We give great deference to the trial court's assessment, notwithstanding that another trier of fact may have evaluated the expert testimony differently. Bolton, supra. Except as to two passages in Facing Reality, which we discuss below, this record affords no basis to disturb the trial court's findings that certain passages in both curricula violate the statute by including religious beliefs or subjective moral and ethical judgments.
The two passages above referred to appear in the parent/teacher guide to Facing Reality:
The teacher should not be afraid to address the subject of homosexuality when it arises. Students should be directed to the choice that best serves the individual and the community. This is clearly the choice to abstain from homosexual activity, just as they should abstain from heterosexual activity.
Discussions of the compassion and respect due to all persons should certainly include those who identify themselves as homosexual. To subjectively judge any individual is certainly not within the purview of any teacher. To objectively discuss the wisdom of certain choices is. A promiscuous lifestyle is an unhealthy lifestyle, regardless of the sex of one's partners.
Plaintiffs objected to the first passage in its entirety, and to the statement, "To objectively discuss the wisdom of certain choices is," in the second passage, contending these statements imply that homosexuality is the "wrong" choice, and that this implication is founded on religious beliefs or on subjective moral and ethical judgments.
The experts did not discuss these passages. The trial court found that the "choice" referred to in both passages was the choice of an individual's sexual preference or orientation, homosexual or heterosexual, rather than the choice of abstinence, regardless of sexual orientation. The court concluded that any discussion about whether a student's choice regarding sexual orientation "best serves the individual and the community" or is "wise" would necessarily include religious beliefs or subjective moral and ethical judgments.
The Board contends the passages simply direct teachers to instruct students that they should abstain from homosexual activity, just *1254 as they should abstain from heterosexual activity, if the subject of homosexuality arises. The Board claims the passages do not purport to allow or encourage religious, moral or ethical judgments about a student's sexual orientation.
We agree that a fair reading of the passages supports the Board's interpretation rather than the trial court's. The passages state, implicitly or explicitly, that the "choice" to be discussed with students is abstinence, not sexual orientation. The promotion of abstinence in the second passage is based solely on health considerations. Neither passage purports to make religious, moral or ethical statements or judgments about homosexuality or, for that matter, about abstinence.
We shall amend the judgment to delete these two passages from the trial court's injunction. In all other respects, we affirm, as amended and recast, the trial court's findings of violations based on the inclusion of religious beliefs or subjective moral and ethical judgments. The violative passages in this statutory category are quoted in our decree.

Counseling Abortion
Subsection F of § 281 states that no sex education instruction "shall in any way counsel or advocate abortion." Plaintiffs and the trial court construe the word "counsel" as meaning to give advice for or against something, while the Board asserts it means only to favor or recommend.
The litigants agree that the curricula do not recommend abortion. Plaintiffs cite, as violative of the statute, passages in Sex Respect which list numerous health risks of abortion, tout the advantages of adoption with only passing reference to disadvantages, and direct teachers to "[h]ave a speaker from Birthright or some other pro-life organization come and talk about the risks of abortion and the benefits of adoption."
Plaintiffs' expert psychiatrist, Dr. Seiden, defined the term "counsel" as "therapeutic advice giving," either for or against something, and opined that these passages violate the statute by giving advice on the subject of abortion.
Dr. Coulson, the Board's clinical psychologist, agreed that the term "counsel" is sometimes used to mean "therapeutic advice giving," as when a doctor counsels someone about a particular problem, but opined that that meaning has no application in a classroom setting. Dr. Coulson testified that the term "counsel," when used in the context of counseling something rather than someone, means to favorably recommend the thing. Dr. Coulson distinguished "counseling" a subject, which, in his view, means only to speak in favor of it, from "counseling on" a subject, which may including speaking either for or against it. He opined that the challenged passages do not "counsel abortion" because they speak against it rather than in favor of it.
The trial court, without discussing the testimony of either expert, adopted the definition of "counsel" advanced by plaintiffs. The court noted that § 281 prohibits the inclusion of religious beliefs or subjective moral judgments, and contrasted this prohibition with the legislature's earlier attempt to allow instruction in the public schools offering balanced treatment of creation science and evolution science. The court observed that this attempt failed on constitutional grounds. See LRS 17:286.1 et seq. and Edwards v. Aguillard, 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). The trial court stated:
... Paragraph "F" of the statute simply says that no instruction shall in any way counsel or advocate abortion. By use of the disjunctive "or," and in a prudent effort to avoid a constitutional or other attack, it seems obvious that the legislature meant to preclude any instruction which tends to favor or oppose abortion. To conclude that the statute only excludes from instruction favorable comments on abortion, but not statements in opposition to abortion, would circumvent the legislature's efforts to enact a genuinely neutral statute after their strident efforts to do so.
(Emphasis in original.)
*1255 The court found that certain passages referring to the health risks of having an abortion were "essentially informative" and not violative of this portion of the statute, while others
clearly advocate[] adoption over abortion. There is no prohibition in the statute against advocating adoption.... However, to the extent that these passages counsel against abortion and in favor of adoption, rather than present[ing] complete and accurate information as to any advantages and disadvantages of each, the passage counsels against abortion and violates the statute.
The Board contends the trial court interpreted the statutory prohibition against "counseling abortion" too broadly, by reading it to prohibit counseling against, as well as in favor of, abortion. Disputing the trial court's finding that the legislature intended § 281 to be neutral on the subject of abortion, the Board cites statutes from other titles of the Revised Statutes which it claims indicate the legislature's clear intent to oppose abortion. The Board suggests that the trial court's expansive interpretation of § 281 to require that the advantages of abortion be discussed along with the advantages of adoption "flies in the face" of the statute's express prohibition against advocating abortion.
Plaintiffs argue that the prevailing meaning of the word "counsel" is "to give advice." They contend § 281 is clear on its face, precluding the need for comparison with other statutes, and was properly interpreted by the trial court. Dr. Coulson would distinguish the meaning of counseling a subject from counseling someone on a subject. The trial court effectively interpreted the statute to prohibit counseling on abortion, contrary to the express wording of the statute which only prohibits counseling, i.e., recommending, abortion.
The trial court found that the legislature made "strident efforts" to enact a "genuinely neutral" statute when it placed the abortion counseling prohibition in § 281. The court inferred the legislature's intent in this regard from the fact that the Balanced Treatment for Creation-Science and Evolution-Science Act (LRS 17:286.1 et seq.) was held unconstitutional. We note, however, that that legislation was enacted in 1981, by Act No. 685, some two years after the legislature enacted § 281, by Acts 1979, No. 480. The earliest decision holding the Balanced Treatment Act unconstitutional was rendered in 1985, by the federal district court (Aguillard v. Treen, 634 F.Supp. 426 (E.D.La.1985)), and was ultimately affirmed by the U.S. Supreme Court in 1987, as cited supra, long after the legislature enacted § 281. This chronology simply does not support the court's reliance on the fate of the Balanced Treatment Act as evidence that the legislature intended to require that sex education instruction be "neutral" on the subject of abortion.
That the word abortion in the prohibition that no instruction shall "counsel or advocate abortion," has a technical or legal connotation, is not at issue. CC Art. 11; LRS 1:3. The verbs counsel and advocate must be considered in their ordinary sense "according to common and approved usage" (§ 3, supra) and given their "generally prevailing meaning" (Art. 11, supra). There is no absurdity in construing the word or in the disjunctive as LRS 1:9 directs. Compare Bradford v. Louisiana Public Service Commission, 189 La. 327, 179 So. 442 (1938).
Most modern dictionary definitions of the verb counsel are in accord with the 1971 Webster's Third New International Dictionary, unabridged, G & C Merriam Company. This authority defines the verb as meaning "1. to advise esp. seriously and formally ... esp: to advise (students) on personal ... problems. 2. to recommend esp. as the best or most expedient act, course, or policy."
The generally accepted meaning of the verb advocate, is also in accord with the Merriam authority, supra, which defines the verb as "to plead in favor of...: support or recommend publicly...: to act as advocate."
In generally accepted usage or sense, then, the legislature is saying the instruction shall *1256 not counsel (advise, recommend) or advocate (plead for, support or publicly recommended) abortion. We must respectfully disagree with the trial court that the statutory prohibition is neutral and neither for nor against abortion.
Two of the passages that the trial court excluded from the Sex Respect curriculum for violating the prohibition against counseling abortion were also objected to by plaintiffs on other grounds, such as being factually inaccurate or as quizzing students about their sexual, moral or religious beliefs or practices. We hereafter address the propriety of the exclusion on these other grounds.
The excluded passages, one asking "Does she get an abortion to kill the baby?" and another referring to abortion as "the killing of a grandchild," while objected to in plaintiffs' pleadings only for counseling abortion, were effectively objected to at trial on the ground of including religious beliefs or subjective moral and ethical judgments. CCP Art. 1154; Roberson v. Provident House, 576 So.2d 992 (La.1991); Fontenot v. Garland, 352 So.2d 251 (La.App. 3d Cir. 1977), writ denied. Rabbi Matuson was allowed to testify, without objection by defendants, that some, but not all, religions view abortion as the killing of a child. Rabbi Matuson explained that his religion, the Reformed Jewish faith, allows and even requires abortion in some circumstances, such as to save the mother's life.
Dr. Carney's testimony on behalf of the Board that the reference to abortion as killing is "medically accurate" was outside his field of expertise, ethics, and was not corroborated by the Board's M.D., Dr. Archer.
These two passages should have been excluded for including religious beliefs or subjective moral and ethical judgments.
The other passages that the trial court excluded for counseling abortion were objected to only under subsection F of the statute and not on any other specific statutory basis. We shall not find those passages to be in violation of the statute and shall not include them in the recast judgment.

Factually Inaccurate Information
In § 281A(2), "sex education" means "the dissemination of factual biological or pathological information that is related to the human reproduction system." Plaintiffs challenged certain passages describing the physical or psychological aspects and risks of sex as factually (or medically, M) inaccurate. Experts on each side offered testimony about the accuracy of the questionable passages.
The trial court found that some, but not all, of the challenged passages were inaccurate, some being either "facially" inaccurate as written, and others being "incomplete," or "effectively inaccurate." Examples of passages deemed facially inaccurate by the experts and the trial court are:
Teens with a low opinion of themselves are more likely than other teens to get involved in pre-marital sex.
Saving sex until marriage, by contributing to our emotional growth, will help us become better parents when we are married.
There's no way to have pre-marital sex without hurting someone.
A male can experience complete sexual release with a woman he doesn't even like, whereas a woman usually can't do so unless she loves her partner.
Three examples of passages found "effectively inaccurate" are:
1. Why do teenagers who want to have pre-marital sex feel unfree, feel guilty?
Drs. Bocchini and Seiden testified that some, but not all, teenagers do.
2. It's often the girls who are starved for male affection because they didn't have a good relationship with their father who get involved in sex outside of marriage.
According to Dr. Seiden, both girls and boys who do not have a good relationship with their parents (not just girls) may seek affection outside of marriage and may equate sex with affection.
3. Our nation's laws which are designed to protect the health of its citizens, require *1257 a blood test before couples can get their marriage license. The test will tell you if you or your intended spouse is carrying an S.T.D. That way, any treatable S.T.D. can be cured before the honeymoon, to prevent spreading the infection to a healthy spouse.
Experts on both sides testified that many states, including Louisiana, do not require a blood test in every instance before issuing a marriage license and that most sexually transmitted diseases cannot be detected by a blood test.
The court also found effectively inaccurate and excluded a passage in Sex Respect which states that anyone who has an abortion "will feel guilt, depression, and anxiety ... in the long run" and lists numerous physical risks of abortion, such as "damage to ... reproductive organs, [h]eavy loss of blood, infection, ... increased risk of miscarriage or birth complications with future pregnancies... [and possibly] infertility." Drs. Bocchini and Seiden opined that the statement of the psychological risks of abortion is inaccurate for describing these risks as inevitable, when in fact many women who have abortions do not experience guilt, depression or anxiety. These experts agreed that some women may experience one or more of the physical risks listed, but noted that the curriculum emphasizes the negative aspects of abortion without discussing the physical risks of carrying a child to term. Dr. Otterson described the passage as "blatantly incorrect."
Two passages that were stricken for including religious beliefs or subjective moral and ethical judgments were also found to be factually inaccurate. They state:
As the AIDS plague and herpes are proving, faithful marital relations are good not only for society's moral tone, but for the individual's health too.
Well, no one can deny that nature is making some kind of a comment on sexual behavior through the AIDS and herpes epidemics.
The trial court accepted the testimony of Drs. Bocchini and Seiden that AIDS and herpes are diseases resulting from contact with viruses, which may be transmitted through means other than sexual contact, and that, from a medical standpoint, the development of a disease is not considered to be a "comment" on individual behavior or on society's moral tone. The trial court found these passages to be factually inaccurate, concluding they have "no redeeming value in educating students about human reproduction or the transmission of sexually communicable diseases."
The Board argues that none of the challenged passages should be stricken as inaccurate because the Board's experts opined that each passage is accurate. The Board also claims the trial court again interpreted the statute too expansively, by striking as inaccurate passages which are accurate on their face but are not, in the trial court's view, "fully accurate." The argument again repeated is that the school board, rather than the trial court, is the proper body to assess the "redeeming value" or "educational merit" of the curricula.
The trial court's assessment of the accuracy of these passages was premised on the statutory emphasis that sex education instruction shall disseminate "factual biological and pathological information related to the human reproduction system." The court found that some of the challenged passages were accurate as written, while others were not. With respect to those passages which were accurate on their face but incomplete, the court found that some did not violate the statute, while others did. All of these findings were based on the court's assessment of each passage in context, and in light of the conflicting expert testimony. The experts differed, not only about whether the challenged passages were accurate on their face, but also about whether those that were facially accurate but incomplete were effectively inaccurate from a factual standpoint.
When the expert testimony accepted by the trial court is considered, we cannot say that the trial court overstepped its bounds by interpreting the statutory requirement *1258 of factual accuracy to encompass both facial and effective accuracy. A court may accept one expert's testimony over another's contrary opinion. See and compare Bolton and Tyler, both cited supra. We cannot say the trial court erred in its findings of violations under the "factual" requirement. The factually violative passages are fully quoted in our decree.

Quizzing Students About Sexual, Moral or Religious Beliefs or Practices
Students "shall not be tested, quizzed, or surveyed about their personal or family beliefs or practices in sex, morality, or religion." § 281A(2). Plaintiffs alleged that each curriculum contains passages that violate this "quizzing" part of the statute, but did not offer expert testimony in this regard. In response to the Board's contention that plaintiffs failed to carry their burden of proving violations of this part of the statute because they did not present expert testimony, the trial court stated that it was "certainly equipped to examine the passages presented without ... expert testimony."
We illustrate some, but not all, of the "quizzing" passages the trial court found to violate the statute [the prohibition against quizzing, testing or surveying students about their sexual, moral or religious beliefs or practices]:
What happens when our need for love and lifetime commitment is filled with a substitute like pre-marital sex?
If teens didn't get pregnant, would teenage sex still be a problem? Explain.
What would you say to someone who stated, "No one who really loved their baby could ever give it up"? List some specific ways adoption helps build stronger families.
Give an example of how a self-centered sexual choice might hurt a family.... Name four emotional or psychological consequences of pre-marital sexual involvement.... Name four opportunities which pre-marital sexual activity might foreclose for you.
Some individuals derive pleasure from sexual activity without the commitment of marriage. They would argue that it "hurts no one." Is this argument valid? Can you give examples of how someone can be hurt in such an arrangement? Give examples of how society might be harmed by promiscuous sexual activity. How might abstinence and monogamy benefit society?
The manner and content of AIDS education is very controversial. Some say that we should not use fear as a tactic. What do you think? Should young people have some fear of contracting AIDS? What approach would you use to stop the spread of AIDS? Be specific.
Several years ago there was a big push to put condom advertisements on network T.V. Why do you think this was a heated debate? How do you think a good advertiser could portray the condom? Would they emphasize its weaknesses? Explain.
The Board repeats its argument that plaintiffs' failure to offer expert testimony about these passages precludes a finding that any of them violate the statute. The law is not that rigid.
Expert testimony is appropriate "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue[.]" LCE Art. 702. The two curricula at issue are in the record. The specific statutory terms against which the trial court measured the challenged passages do not contain technical terms or present issues that depend on specialized knowledge for their resolution. Expert testimony was not required for plaintiffs to establish violations of this part of the statute. See and compare Bechtel v. Entringer Bakeries, Inc., 422 So.2d 1299 (La.App. 5th Cir.1982). The court there found that expert testimony on the issue of parish building code violations was properly excluded because the issue was not "beyond the understanding of the average juror." 422 So.2d at 1301.
*1259 Again the Board asserts the trial court interpreted the statute too broadly, arguing that the passages found violative of the "quizzing" prohibition simply ask students to discuss course material by applying only the information they have learned in class without asking them to disclose or express their sexual, moral or religious beliefs or practices. Plaintiffs counter that the violations found by the trial court simply are "obvious."
The legislature in subsection A(3) clearly requires sexual abstinence to be primarily emphasized in a sex education curriculum. The shalls and shall-nots in subsection A(2) should not be read in isolation, but with each other and with the other parts of the statute.
"Sex education" shall primarily emphasize sexual abstinence and shall be factually accurate (biologically and pathologically). Students may study or be taught about the human reproduction system, puberty, pregnancy, childbirth, menstruation, menopause, and sexually transmitted disease (the first sentence of A(2)), but shall not study or be taught religious beliefs, practices in human sexuality, nor the subjective moral and ethical judgments of the instructor or other persons (the third sentence of A(2)).
The statute thus impliedly recognizes that religions and denominations thereof (Judaism and its divisions, Islam and its divisions, Christianity and its Catholic and Protestant denominations) have religious beliefs. The statute further recognizes that while some persons perhaps may be amoral, many persons make and hold moral or ethical judgments on the subject of sex. The statute also forecloses from study individual or cultural sexual practices, although no passages in these curricula were alleged to teach such practices.
The legislature in the first quoted prohibition of A(2), which broadly states, in our opinion, the shalls and the shall-nots, is declaring that neither a religious belief nor the subjective moral and ethical judgments of the instructor or of any other person shall be included or taught in a sex education curriculum. No one is to "teach" what any religious denomination believes about human sexuality. Similarly, no one shall relate in secular or non-religious terms his or her judgment about what is moral or immoral or ethical or unethical on the subject of sex. Thus any curriculum, to comply with the statute, must be factually accurate, must primarily emphasize sexual abstinence and, as well, comply with the statutory prohibitions, including the prohibition in the fourth sentence of A(2) that students shall not be tested, quizzed, or surveyed about their personal or family beliefs or practices in sex, morality, or religion.
In our opinion, the fourth sentence of A(2) may be reconciled with the other parts of the statute by noting that it is not directed at what shall or shall not be taught to students, but what shall not be elicited from students. The prohibition that students shall not be tested, quizzed, or surveyed does not suggest that students may not discuss or be questioned about factually accurate course material, provided they are not asked to disclose their personal or family beliefs or practices in sex, morality or religion.
In this light, we note that some, but not all, of the passages excluded by the trial court on the basis of impermissible "quizzing" simply question the student about factually accurate course material. Others raise questions or issues for discussion that are related indirectly to permissible areas of instruction. With two exceptions, which we note below, none of the excluded passages asks or requires a student to state his or her personal or family beliefs about sex, morality or religion (as by asking, "Do you believe pre-marital sex is morally wrong? Do your parents believe it is morally wrong for teenagers to have sex?"), nor to discuss personal or family sexual practices (as by asking, "Have you ever had sex? Have you ever used a condom? Has anyone in your family ever had sex outside of marriage?").
In our view, a fair and reasonable, and not a strained, construction of the statutory language leads us to conclude that the statute does not completely foreclose student *1260 participation in questioning or discussion about issues related to sex, morality or religion, but only prohibits asking students to disclose their personal or family beliefs or practices in those areas. Only two of the passages found violative by the trial court solicit such disclosures:
1. What does it mean to be mature? ...
Spiritually _____
What can you do to help yourself mature in each way? ...
Spiritually _____
2. Do condoms make sexual activity moral?
We shall amend the judgment to enjoin only these two passages as violative of the "quizzing" prohibition.

Evidentiary Issues
The Board contends the trial court erred in its rulings on two evidentiary issues: the testimony of James Coughlin, the author of Facing Reality, and evidence as to the effectiveness of both curricula in reducing or delaying the onset of teenage sexual activity. The excluded evidence was formally proffered for our review.
The Board says that Coughlin's testimony is relevant to show whether the curriculum he authored reflects his subjective moral and ethical judgments. Contending the trial court implicitly found that it did, the Board argues that it should have been given the opportunity to affirmatively show that the curriculum does not. The Board urges that the evidence of the effectiveness of both curricula should have been admitted to impeach the testimony of plaintiffs' experts that was critical of the curricula.
Plaintiffs maintain the trial court correctly ruled. They argue that Coughlin's asserted intention to exclude his subjective moral and ethical judgments from the Facing Reality curriculum when he wrote it is irrelevant to determine whether the curriculum, as written, complies with or violates § 281. They also contend the evidence about the effectiveness of the curricula was irrelevant to whether the curricula contains material prohibited by the statute. The statute makes no requirement that the curricula be "effective." We generally agree with plaintiffs.
Rulings admitting or excluding evidence based on its relevance are within the trial court's great discretion and are not disturbed on appeal unless the record demonstrates an abuse of that discretion. Shaw v. Fidelity & Cas. Ins. Co., 582 So.2d 919 (La.App. 2d Cir.1991); Ketcher v. Illinois Central Gulf R. Co., 440 So.2d 805 (La.App. 1st Cir.1983), writ denied. No such abuse is shown here.

CONTEMPT MATTERS
The Caddo Parish School Board and its president, Judy Boykin, were held in constructive contempt of court because of their respective conduct occurring after the trial court judgment was rendered. The trial court's contempt rulings involve only the Board and Ms. Boykin. The appellant-publisher of the curricula is not concerned in those rulings or in our review thereof.

Boykin's Conduct
At the close of the highly publicized trial, the trial judge told the lawyers and the litigants that he would, in accordance with his judicial oath of office, decide the case based solely on application of state law to the evidence, and not on his personal beliefs about these controversial and divisive issues. The judge repeated his pledge to decide the case objectively, without regard to his own beliefs or public opinion, in his 47-page opinion of March 18, 1993, which was generally favorable to the plaintiffs.
Within hours after that opinion was rendered, the Board's president, Judy Boykin made these statements to the press at the Board's office:
We are disappointed and feel that the Court has ignored a substantial body of credible evidence in making its determination.
I am deeply disturbed at the decision of the Court in that a great deal of evidence *1261 was ignored, and I think that anyone who reads the ruling will see some discrepancies and that the judge did not in my opinion stick to, and these are my opinions, did not stick to his pledge, you know, to ignore his personal opinions and to rule on state statute.
I believe he ignored data concerning certain figures, and I'd like to look at it a little more closely.
About three weeks later, on April 8, 1993, Boykin made this statement while appearing as a panelist on a local TV talk show:
Also, as you go through the judge's ruling, you can see that, apparently, in my opinion, that he ruled based on his own beliefs and not based on state law. There are some real contradictions, I feel, in his ruling.

The Board's Conduct
After the trial court stated, in response to the Board's motion to recall the injunction, that the injunction applied only to the passages that were found to violate the statute, and not to the curricula in their entirety, the Board voted to modify these curricula by deleting the violative passages and to have the modified curricula taught before the end of the school term, which was fast approaching. The copyright owner of Sex Respect allowed the Board to modify that curriculum by "whiting out" the violative passages on each page and photocopying the edited pages for use in the classroom, making it impossible for students to discern what had been removed from the text. The Board's method was not approved, however, by the copyright owner of Facing Reality, who required the Board to "black out" the violative passages in each copy of the curriculum by marking through them with black ink.
The Board's attorneys supervised the editing of a master set of each curriculum by school board staff members. Temporary workers were then hired to edit the classroom copies to conform to the master. The Board did not respond to plaintiffs' request to review the edited versions of both curricula before edited copies were placed in the schools.
Facing Reality was scheduled to begin being taught to tenth grade students on May 10, 1993. On that day a local news reporter visited a 10th grade classroom at one high school and filmed the class using the edited textbooks in the teacher's presence, as well as several comments by the teacher outside the students' presence about the difficulties of having to teach the edited curriculum so late in the school year. The reporter also filmed one student in the classroom demonstrating that she could read some of the "blacked out" passages in the student text by holding the page up to a light. The teacher does not appear on camera during this demonstration, the audio part of which contains laughter and loud comments by other students in the classroom.
The film was aired on the local news at 5:00, 6:00 and 10:00 p.m. on May 10, and again the next morning. The trial judge saw the broadcast on the evening news. He heard nothing from any Board representative that evening or the next morning. On the judge's initiative, a status conference with the attorneys in the case was scheduled for 11:00 a.m. on May 11. Upon learning of the problem, the Board's superintendent issued a directive to all high schools to cease using the Facing Reality materials until the matter was resolved. The Board then persuaded the copyright owner of Facing Reality to allow the modifications to be made by the "whiting out" and recopying method. The white-out-recopied version of Facing Reality was returned for classroom use on May 18, 1993, with court approval.

Contempt Rulings
Plaintiffs brought the rules for contempt against the Board, its superintendent, its attorney and its president, effectively alleging that the Board had willfully disobeyed the injunction by introducing Facing Reality into the classroom without having removed all of the violative passages, and that Boykin's remarks criticizing the trial judge's decision *1262 and impugning his integrity were intended to interfere with the orderly administration of justice or to impair the dignity of the court or respect for its authority. See CCP Art. 224(2), (10).
At the hearing on the contempt rule, plaintiffs introduced in evidence videotapes of Boykin's remarks and of the May 10 news broadcast about Facing Reality, above described. Plaintiffs' only witness was one of plaintiffs' co-counsel, who generally described the problems that arose from the original editing of Facing Reality. When plaintiffs attempted to call individual defendants as witnesses during their case in chief, the defendants objected that they could not be called as witnesses for plaintiffs because the proceedings were criminal in nature, requiring plaintiffs to prove their allegations without testimony from the defendants. The court sustained the objection.
At the close of plaintiffs' case, the defendants moved for involuntary dismissal or acquittal, arguing that plaintiffs' evidence did not prove any willful conduct on their part that would amount to contempt. The trial court sustained the motion as to the Board's superintendent and attorney, but denied it as to the Board and Boykin.
During the defendants' case, the Board's superintendent and attorney each testified that their intent was to fully comply with the court's order, that they instructed others involved in the editing process accordingly, and that they were not aware of any suggestions or intentions by anyone affiliated with the Board to "cut corners" or deviate from the court's order in any way during the editing process.
Boykin explained that she was merely expressing her personal opinion about the trial court's decision in each of the remarks she made. She said she had no intent to show disrespect for the court or its authority. She additionally argued that her remarks, even if found to be contemptuous under CCP Art. 224(10), were protected under the First Amendment of the U.S. Constitution because they did not present a clear and present danger of interfering with the administration of justice in future rulings in the case, on such matters as the Board's motion to recall the injunction and motion for new trial.
The trial court effectively found the Board grossly negligent in its original editing of Facing Reality before May 10, 1993, but concluded that the Board's actions during that time were not a deliberate violation of the injunction. The court reached a different conclusion, however, about the Board's conduct after the news broadcast of May 10 showed that students could still read some of the enjoined passages, stating:
After the reporter's interviews and the television broadcast, the faculty and members of the school's administration must certainly have been aware of this occurrence.... Despite the broadcasts and the knowledge that these passages could be read, the curriculum was returned to students on the morning of May 11, 1993 ... without the violative language having been effectively removed.... There was no effort by the Board or its representatives to notify the court of these events or remove the curriculum prior to this court's intervention. Beyond any doubt, the evidence establishes that the Board's actions were wilful and in direct contravention of this court's injunction, and constitute contempt.
The court imposed a nominal fine of $100 on the Board, noting that taxpayers would have to pay any fine and that the Board had voluntarily removed Facing Reality from the schools when informed of the violations.
The court found that Boykin "essentially stated that the court lied when making a pledge to apply the law as written" and did so with the intent to detract from the dignity of the court and respect for its authority. The court was particularly disturbed by Boykin's testimony that she did not know anything about the judge's personal beliefs in the matter when she stated that those beliefs were the basis for his decision. The court noted that Boykin's conduct "contributed to the widespread misunderstanding of the issues involved in this case" and was "the first *1263 domino" in a chain of events that further polarized the community and provoked threats of harm against the trial judge from unidentified persons.
Boykin's argument that her remarks were constitutionally protected was rejected by the court on both procedural and substantive grounds. The court noted that Boykin had not pleaded the unconstitutionality of CCP Art. 224 or made the state attorney general a party to the action. The court also stated that while Boykin's remarks "did not influence the court's subsequent decisions in reviewing its original opinion ... there was a clear and present danger that her comments and the publicity which ensued had the potential to influence the decision of the court." The court ordered Boykin to pay a "purely symbolic" fine of $1, stating that "no amount of money can restore the true damage occasioned in this community by Mrs. Boykin's conduct."

Arguments
Both the Board and Boykin seek reversal of their contempt convictions, arguing that they, like the other defendants, should have been acquitted at the close of plaintiffs' case in chief because plaintiffs did not prove beyond a reasonable doubt that the Board willfully violated the injunction, or that Boykin's remarks presented a clear and present danger of interfering with the administration of justice, which showing is necessary to remove them from the protection of the First Amendment. Plaintiffs contend their burden of proof was preponderance of the evidence but argue alternatively that the evidence in their case in chief, and as a whole, proves contempt as to both defendants beyond a reasonable doubt.

BURDEN OF PROOF
A contempt proceeding incidental to a civil action is considered to be a civil matter if its purpose is to force compliance with a court order, but is treated as a criminal matter if its purpose is to punish disobedience of a court order or other conduct that the law defines as contemptuous. State in Interest of R.J.S., 493 So.2d 1199 (La.1986); Geo-Je's Civic Ass'n, Inc. v. Reed, 525 So.2d 192 (La.App. 1st Cir.1988). The purpose here was clearly to punish, inasmuch as the Board had completed its re-editing of Facing Reality to the court's satisfaction about three months before the contempt rule was heard, and Boykin was never alleged to have violated a court order. Plaintiffs were thus required to prove contempt as to each defendant beyond a reasonable doubt. R.J.S., supra.

SUFFICIENCY OF EVIDENCE AGAINST BOARD
An essential element of plaintiffs' case against the Board was proof that the Board willfully or intentionally disobeyed the injunction. R.J.S., supra; Norris v. Monroe City School Bd., 580 So.2d 425 (La. App. 2d Cir.1991). The trial court found that the Board's failure to effectively remove the violative passages from Facing Reality before May 10, 1993, was not willful, essentially concluding that the Board did not intend to mark through the violative passages in a manner that would allow them to be read by students and did not know of the flaw that existed in some of the materials when it initially placed the edited curriculum in the classrooms. The court based its finding of contempt solely on the fact that students had access to Facing Reality on the morning of May 11, 1993, the day after the news broadcast showing the editing deficiency was aired.
At the close of the hearing, the court conceded there was no evidence that the Board's superintendent, attorney or any of its 12 members had seen the May 10 broadcast. No member of the faculty or administration of the school where the filming occurred was called to testify. The videotape of the broadcast that was filed in evidence does not affirmatively show that a teacher or administrator was present while the student read through the markings in the text. The teacher who was filmed in other portions of the broadcast does not appear on camera in the portion of the broadcast showing the student reading some of the blacked-out passages, *1264 during which time the students are noticeably louder and more unruly than they are in earlier segments of the broadcast, while the teacher is present.
The trial court concluded that the members of the school's faculty and administration "must certainly have been aware" of the editing deficiencies in Facing Reality, and charged the Board with this imputed knowledge. The evidence in this record, however, is simply insufficient to show, either directly or by inference, beyond a reasonable doubt, that anyone affiliated with the Board knew that some of the violative passages had not been effectively deleted from Facing Reality before the court brought the matter to the attention of the attorneys in the case the next day.
Plaintiffs have shown only that the Board negligently violated the injunction, not that its violation was willful or intentional. On this record, the evidence, even when viewed in a light most favorable to support the judgment, is legally insufficient to convict the Board of contempt under CCP Art. 224(2). See and compare State in Interest of R.J.S., supra.

SUFFICIENCY OF EVIDENCE AGAINST BOYKIN
Boykin argues that she cannot be punished for contempt for making remarks that are constitutionally protected by the First Amendment. Plaintiffs contend the constitutional issue should not be reached because Boykin did not plead that CCP Art. 224 is unconstitutional or make the attorney general a party to the proceeding. We cannot agree. Boykin is not arguing that the article itself is unconstitutional, or that it defines contempt in an unconstitutional manner, but only that her remarks, even if found to be intentional and therefore within the article's definition of contempt, are not punishable as contempt because they constitute speech that is constitutionally protected and therefore not punishable by state law. The attorney general's joinder is required only if it is alleged that a state law is unconstitutional. CCP Art. 1880.
Speech that is critical of a court or a judge is protected by the First Amendment unless it is shown to present a clear and present danger that it will influence the court's decision in a pending case. Graham v. Jones, 200 La. 137, 7 So.2d 688 (1942), citing Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941). See also Wood v. Georgia, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962) and Citizens Against Gov. Takeover v. Giarrusso, 490 So.2d 510 (La.App. 4th Cir.1986).
No such showing was made here. Plaintiffs proved only that Boykin made the statements at issue. We accept, for discussion purposes, the trial court's finding that Boykin intended to show disrespect for the court or its authority when she made her remarks. These findings, however, are legally insufficient to support her contempt conviction in the face of her constitutional argument.
In moving for her acquittal at the close of the plaintiffs' case, Boykin's counsel stated that plaintiffs "would have to show there was a clear and present danger that [her conduct] would cause the Court to overturn its decision." The court replied, "Well, it obviously hasn't done that.... And it's not going to." Boykin's motion for acquittal should have been granted at that juncture.
After hearing the defense evidence and closing arguments, the court stated:
As I said candidly at the beginning of the trial[,] there are no words in the English language that Ms. Boykin or anyone else could use to make me stray from the application of the law. And so far as that test, it's met. She didn't make me stray after that; she can't make me stray in the future. The law is the law and I'm going to apply the law, regardless of what anybody else says about me.
This record does not allow, but negates, a finding that Boykin's remarks presented a clear and present danger of interfering with the court's subsequent rulings in the case. We must reverse Boykin's contempt conviction *1265 on constitutional grounds, notwithstanding that her remarks were patently offensive to the trial judge, who obviously, in our view, made herculean efforts to be fair and impartial both during and after the trial of this controversial, highly publicized and emotionally charged case. See and compare the constitutionally protected remarks in Graham, Bridges, Wood and Giarrusso, all cited supra.
While the language of Ms. Boykin may have added in some way to the emotional intensity of the controversy generated by this case, neither her language nor the trial court's language caused the controversy to arise. The controversy arose simply because the legislature, however inartfully, by specific mandates and prohibitions, has said what a sex education curriculum shall and shall not contain. The trial court should be commended for applying the law enacted by the legislature.

STANDARD OF REVIEW IN TRIAL COURT
The Board's first assignment of error on appeal in the sex education case is based on this language in the trial court opinion which prefaced the court's discussion of each questionable passage in the curricula:
As required by the scheduling order, the plaintiffs have specified which passages are at issue. Some passages will be addressed individually, and others in groups when they include some similarity. In making this examination, the court is required to determine whether the statements under review tend to promote the education of the students by dissemination of factual information. If the statements make no substantive contribution toward education on a factual basis, and if they address areas proscribed by the statute, they must be stricken.
The Board contends the court used an erroneous "standard of review" by considering, in addition to the express statutory constraints applicable to the curricula, whether the curricula make a substantive contribution toward education on a factual basis. The Board argues it is the province of a school board and not the court to assess the educational or academic merit of curricula selected for sex education and that the court improperly substituted its assessment for the Board's. According to the Board, "the trial court must give deference to the decision of the school board and find a violation of [§ 281] only where the school board's actions are not supported by a rational basis."
To support its argument, the Board cites such cases as: La. Ass'n of Ed. v. St. Tammany Par. Sch. Bd., 430 So.2d 1144 (La.App. 1st Cir.1983), writ denied; Earnest v. Caldwell Parish Sch. Bd., 368 So.2d 801 (La.App. 2d Cir.1979); Shaw v. Caddo Parish School Bd., 347 So.2d 39 (La.App. 2d Cir.1977), writ denied; and State ex rel. Rathe v. Jefferson Parish School Board, 206 La. 317, 19 So.2d 153 (1943).
The school board action challenged in each of these cases was, respectively, allocation of sales tax revenue (Brown), acceptance of a job application (Earnest), termination of a principal's sabbatical (Shaw) and demotion of a principal to a lesser-paying teacher position (Rathe). In each case the school board's action was found to have been within the board's discretion. In no case was the school board's action alleged to violate a statute of the legislature.
We agree that under the circumstances of the above cited cases, when the board is clearly acting "within the limits of [its] authority," (Rathe, 19 So.2d at p. 167), the courts owe great deference to the board's decision. This deferential standard of review does not apply, however, when the board's action is challenged as violative of a statute. The difference may be illustrated by comparing Cunningham v. Franklin Parish School Bd., 457 So.2d 184 (La.App. 2d Cir.1984), writ denied, with Jackson v. St. Landry Parish School System, 407 So.2d 51 (La.App. 3d Cir.1981), writ denied. In Cunningham, the school board terminated a tenured teacher in accordance with the removal procedures of LRS 17:443. We stated:

*1266 The standard of judicial review of a school board action is to determine whether there is a rational basis for the board's determination supported by substantial evidence. In such cases, the reviewing court must neither substitute its judgment for the judgment of the school board nor interfere with the board's bona fide exercise of discretion. [Citations omitted].
457 So.2d at 187.
The "rational basis" standard was not applied in Jackson, however, because that school board failed to follow the statutory procedure for removal of a tenured teacher. The reasonableness of the board's decision was not addressed because the board's action, contrary to the statute, was found to have "no legal effect." 407 So.2d at 55.
When the action of a municipal or parish board violates a statute, the party challenging it may obtain relief without having to show that the action amounts to an abuse of discretion. See and compare Mayor & Council v. Ascension Parish Police Jury, 468 So.2d 1291 (La.App. 1st Cir.1985); City of Bossier City v. Lee, 445 So.2d 92 (La.App. 2d Cir.1984); and La. Associated Gen. Contr. v. Calcasieu Parish School Bd., 586 So.2d 1354 (La.1991).
The school board action challenged in the last cited case was the board's requirement that all contracts awarded on its public works projects contain a provision to pay laborers the prevailing wage rate. The board argued that the inclusion of the prevailing rate provision was incidental to its authority to build and repair school buildings, granted in LRS 17:81. The plaintiff-contractors alleged that the board's action violated the Public Bid Law, LRS 38:2211, which requires public contracts to be awarded to the "lowest responsible bidder."
The trial court ruled in the school board's favor but was reversed on appeal. The supreme court affirmed the appellate court, effectively finding that the Public Bid Law, which was enacted to secure free and unrestricted competition among bidders, limited the board's implied authority, derived from its express authority to build and repair schools, to prescribe bidding conditions applicable to its public work contracts, notwithstanding that the Public Bid Law did not expressly prohibit the inclusion of prevailing wage rate provisions in public contracts. The court's analysis of the issue was framed by the general principle that local school boards are creatures of the legislature and have only such powers as are expressly or implicitly granted to them by the legislature. 586 So.2d at 1361, 1367.
Two of the three dissenting judges disagreed with the majority's conclusion that the school board's action was not incidental to its express authority under LRS 17:81. A third judge dissented without assigning reasons.
It has been noted that the formation of curricula for public school students is not one of the powers expressly granted to local school boards under LRS 17:81. Faul v. Superintendent of Ed., 367 So.2d 1267 (La. App. 3d Cir.1979). The legislature has prescribed the required courses of study in elementary and secondary public schools. See LRS 17:154, 261-279.
Sex education instruction is permitted but not required. § 281. The statute expressly delegates to the local school board certain decisions about sex education instruction, such as "whether or not instruction in such matter is offered and at what grade level it is to be offered," provided that it shall not be offered below grade seven. § 281A(1)(a). The qualifications for sex education instructors are to be established, and instructors are to be selected, "solely and exclusively by the public local or parish school board." § 281B. All materials to be used in sex education instruction must be approved by the local or parish school board and by a parental review committee, whose membership is determined by the board. § 281C. The board is authorized to provide procedures for allowing students to "opt out" of sex education instruction (§ 281D), and to investigate, correct and punish statutory violations (§ 281E).
*1267 The legislature has not delegated, but has retained, the authority to define sex education and to establish certain basic guidelines for what may and may not be taught as sex education instruction. See §§ 281A(2), A(3) and F, quoted supra. The legislature has defined "sex education" as "the dissemination of factual biological and pathological information that is related to the human reproduction system." Our emphasis.
The trial court's prefacing remarks that the challenged passages will be reviewed to determine whether they "tend to promote the education of the students by dissemination of factual information" or "make [a] substantive contribution toward education on a factual basis" simply recognize the statutory requirement that sex education must teach "factual biological and pathological information... related to the human reproduction system."
We cannot agree with the Board's contention that the trial court improperly usurped the board's authority to determine the educational merit of the curricula. It is squarely within a court's province to make the legal assessment whether the curricula selected by the Board comply with the statute. The Board clearly has the authority, under § 281C, to assess the educational merit of several proposed sex education curricula for its students and to select a curriculum. The Board's selection of one or more of the recommended curricula, however, will not shield the selected curricula from judicial scrutiny when the curricula are alleged to violate specific prohibitions of a state statute.
On this record, we do not find that the lower court applied an improper standard of review to the challenged passages.

RECAST DECREE
While the recast judgment amending the trial court judgment of March 18, 1993, requires deletion of specific written passages in the sex education curricula adopted by the defendant school board, which passages have been found to be in violation of LRS 17:281A(2), this court notes that some of the specified passages to be deleted either are, or may be, reproduced in substantial part from one book in each curriculum into another book in that curriculum, each curriculum containing a student text and a printed guide or manual for use by either or both the teacher and parents of the student. For that reason, where the recast decree mandates the deletion of a specific written passage from the page of one book in the curriculum, the defendant school board is hereby ordered to delete that same passage where it is substantially reproduced in another book or books in that curriculum.
Our recast decree is as follows:
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the specific written passages hereafter set forth that are contained in the sex education curricula, Sex Respect and Facing Reality, adopted by the defendant, Caddo Parish School Board, violate LRS 17:281A(2), as indicated. The defendant school board is hereby ordered to remove or delete from the respective curricula the passages specified below, and those same passages where they are substantially reproduced in another book or books of each respective curriculum, before again permitting the use of the curricula in the schools under its supervision:

SEX RESPECT CURRICULUM
STUDENT TEXT, Quizzing Violation:
Page 3
What does it mean to be mature? ...
Spiritually ____
What can you do to help yourself mature in each way? ...
Spiritually ____
STUDENT TEXT, Factual Inaccuracies:
Page 4
As the AIDS plague and herpes are proving, faithful marital relations are good *1268 not only for society's moral tone, but for the individual's health too.
Well, no one can deny that nature is making some kind of a comment on sexual behavior through the AIDS and herpes epidemics.
A male can experience complete sexual release with a woman he doesn't even like, whereas a woman usually can't do so unless she loves her partner.
It's often the girls who are starved for male affection because they didn't have a good relationship with their father who get involved in sex outside of marriage.
Page 4
(The sexual arousal chart.)
Page 5
Consequently, they sometimes give boys the impression they want to "go all the way" when actually they only want to be involved in the three early stages: togetherness, hand holding, and affectionate kissing.
I have counseled dozens of young males who have beaten or raped girls. In every case the male's excuse was that "she led me on." Ignorance of the steps of physical intimacy can have serious, even fatal, consequences.
Page 12
Why do teenagers who want to have pre-marital sex feel unfree, feel guilty?
Page 21
The availability of birth control and legal abortions: ... d) puts more pressure on teens to have sex.
Page 23
If pre-marital sex came in a bottle, it would probably have to carry a Surgeon-General's warning, something like the one on a package of cigarettes. There's no way to have pre-marital sex without hurting someone.
Some people think pre-marital sex is okay, as long as they and their partner aren't hurting anyone. After all, sex is a personal, private decision, and it's nobody else's business what we decide to do with our bodiesright? Wrong! Because of the special nature of human sexuality, there's no way to have pre-marital sex without hurting someone. Usually the ones we hurt most are ourselves and our partners.
... the physical risks. These include a sobering list of diseases (like V.D., herpes two, chlamydia, and AIDS), pregnancy, increased possibility of getting cancer of the cervix, and the various health risks involved in using contraceptives or having an abortion. These range from infection to sterility to death.
Because they are not as visible, the psychological risks are sometimes overlooked, but they are no less serious. Feelings of guilt, doubt, fear, disappointment, self-hatred, and the pain of being used can be a heavy burden to carry. Such feelings can interfere with the ability to concentrate on other things, like building friendships, studying, and working at your jobs.
Page 26
Our nation's laws, which are designed to protect the health of its citizens, require a blood test before couples can get their marriage license. The test will tell you if you or your intended spouse is carrying an S.T.D. That way, any treatable S.T.D. can be cured before the honeymoon, to prevent spreading the infection to a healthy spouse.
Page 28
Most girls I know who start having sex do it because they're afraid to say "no," not because they really want to.
Page 39
Teens with a low opinion of themselves are more likely than other teens to get involved in pre-marital sex.
Page 48
Saving sex until marriage, by contributing to our emotional growth, will help us *1269 become better parents when we are married.
Page 50
What if she chooses abortion? Is it fair to make the baby pay for a bad decision she and her partner made? At first, the girl (and guy) may feel relieved that they no longer have to worry about the responsibilities of parenthood, but in the long run, they will feel guilt, depression, and anxiety. These feelings will make it nearly impossible for her ever to forget the abortion. If the girl is a young teen, pregnant for the first time, there's a chance the abortion will cause damage to her reproductive organs. Heavy loss of blood, infection, and puncturing of the uterus can all lead to future pregnancy problems, like premature birth or misplaced pregnancy (in which the baby begins to develop in a Fallopian tube or in the cervix, not in the uterus). There will also be an increased risk of miscarriage or birth complications with future pregnancies. Finally, the woman may suffer infertility, and be unable to become pregnant later, even when she is married, ready and eager for parenthood. Abortion is not the "easy way out" of an unplanned pregnancy.
STUDENT TEXT, Religious Beliefs or Subjective Judgments:
Page 2
The full pleasure of genital sex can't be separated from the spiritual, emotional, and mental parts of our sexuality.... Then our sexuality takes on its real meaning.
Page 3
What does it mean to be mature? ...
Spiritually ____
What can you do to help yourself mature in each way? ...
Spiritually ____
Page 4
Although it may be more sharply focused in some boys than in others, he is experiencing a natural desire for sexual intercourse. His mind, guided by his moral values and also his will, helps him control and rechannel his desires.
As the AIDS plague and herpes are proving, faithful marital relations are good not only for society's moral tone, but for the individual's health too.
Well, no one can deny that nature is making some kind of a comment on sexual behavior through the AIDS and herpes epidemics.
Page 7
People are more than a higher kind of animal. People have mental and spiritual parts in their make-up that even "man's best friend" doesn't have.
Page 31
A woman who waits can act in tune with her inner nature that says sex is a lifetime gift of love.
Sexual intercourse is designed to join a man and a woman who are committed to becoming one.
One 42 year old woman with three children made the following statement to her teenage daughter: "I had sex before marriage. Even though I knew it was wrong, I tried to make myself think it was right because we were engaged. That didn't help. The guilt still haunts me every time I have sex now, and I've been married over 20 years."
Page 48
Emotional maturity comes when we have received the love from our family, friends and spiritual sources that makes us feel secure and whole.
Page 50
What does all this say to the person who is already pregnant? Maybe she recognizes that she doesn't yet have the emotional, psychological, spiritual or financial resources to be a good parent.
Does she get an abortion to kill the baby?
*1270 TEACHER GUIDE, Religious Beliefs or Subjective Judgments:
Page T-6
Spiritual values are an important aspect of human sexuality.
We don't discuss the psychological bond that confuses us when we perform an action that is designed to renew marriage vows and bind a couple that is united for life.
Modern psychology has proven that man is much more than an animal. He is also a mental and spiritual being.
Page T-10
Spiritually: Accepting things you can't change but willing to work hard to change what you can, putting others first, taking time to consider the deeper meaning of life, setting goals that put faith in a greater power or principle than oneself.
What can you do to help yourself mature in each way? ...
Spiritually: Attend worship services regularly, seek out friends who have strong moral values, develop a love for other people and a hunger for truth.
Page T-11
Human reproduction has a higher meaning than animal reproduction.
PARENT GUIDE, Factual Inaccuracies:
Page PG-4
Recent evidence indicates that sex education programs that instruct for genital activity with contraceptives and present abortion as a form of birth control have not, in fact, reduced the number of teen pregnancies. From 1970 to 1980, unwed teen pregnancies had increased from 300,000 to 750,000, even though it was reported that more teens were using contraceptives and using them more effectively.
Health texts tell us that the effects of premarital sex are sexually transmitted diseases and/or pregnancy.
Page PG-10
Research among high school seniors who were not sexually active revealed the following as the two most important reasons teens give for avoiding sexual activity: 1) "I don't want to disappoint my parents." 2) "I'm afraid of getting pregnant." Parents who offer their teens contraceptives destroy both reasons.
PARENT GUIDE, Religious Beliefs or Subjective Judgments:
Page PG-5
Sex in those early relationships, even when sincere, only multiplies the heartbreak and stress, while confusing the soulthe inner being that longs to express its real sexual self.
Page PG-9
According to Dr. Robert Coles, Psychiatrist at Harvard Medical School, "What children need as much as food, clothing, and a good education, is a moral purpose. Children need something to live for, not to yield to gross materialism, aimless hedonism and self-indulgence."
Page PG-12
Pregnancy brings either abortion (the killing of a grandchild), or the raising of the child by another child or a grandparent. (Adoption may be the best option).

FACING REALITY CURRICULUM
STUDENT GUIDE, Quizzing:
Page 54
Do condoms make sexual activity moral?
STUDENT GUIDE, Factual Inaccuracies:
Page 54
To date, there has been no definitive study done on if, or how well, the condom might prevent the spread of AIDS. One such study was canceled at UCLA for ethical reasons. Apparently, medical personnel there decided too many participants would be infected to justify the research.
*1271 STUDENT GUIDE, Religious Beliefs or Subjective Judgments:
Page 89
The use of contraceptive technology does not make teen sexual activity safe, moral or even legal.
Premarital sexual activity does not become a healthy choice or a moral choice simply because contraceptive technology is employed. Young persons will suffer and may even die if they choose it. They "mythology of contraception" must be challenged by anyone who teaches human sexuality.
PARENT/TEACHER GUIDE, Quizzing:
Page P/T 47
Do condoms make sexual activity moral?
PARENT/TEACHER GUIDE, Factual Inaccuracies:
Page P/T 47
Health experts tell us that if you abstain from I.V. drug use and premarital sexual contact you have just about eliminated the pathways available to the AIDS virus (H.I.V.).
Do condoms make sexual activity moral? Legal?
PARENT/TEACHER GUIDE, Religious Beliefs or Subjective Judgments:
Page P/T 3
The spiritual consequences of promiscuity are seldom addressed by such curricula.
Page P/T 4
In view of this, it is absurd to suggest, as some have in the recent past, that human sexuality should not be taught within a moral framework in the public school
Your task as adults is to help your community and school system define what moral expectations you wish to present to your children. Some of the main questions raised by this book are moral ones. Is it moral for your sons and daughters to engage in sexual activity before marriage? The physical, psychological and spiritual risks are overwhelming.
Page P/T 15
AIDS flourishes upon a moral landscape that places many sexual choices on a level terrain. AIDS will be most successfully contained within a moral landscape that makes it clear that self-serving sexual preferences are not on a level with self-discipline and commitment.
Page P/T 24
The words "and spiritual" in the sentence, "As they are compiling the list, remind them that the consequences include physical, social, emotional and spiritual ones."
Page P/T 60
... less religiosity ... absence of moral teaching ...
Costs below are assessed to the defendant, Caddo Parish School Board. Costs of the appeal are assessed one-half to the defendant School Board and one-half to plaintiffs.
The contempt convictions of the Caddo Parish School Board and its president, Judy Boykin, are hereby reversed and set aside at plaintiffs' cost.
Judgment on appeal AFFIRMED IN PART, AMENDED IN PART, AND RECAST. Contempt judgments REVERSED AND SET ASIDE.
HIGHTOWER, J., dissents in part and concurs in part with written reasons.
HIGHTOWER, Judge, concurring in part, dissenting in part.
The majority opinion overturns the contempt convictions of both the School Board and Ms. Boykin, as well as reverses the trial court's interpretation of the "counseling abortion" provision and those exclusions grounded therein. Furthermore, all of the "quizzing" enjoined below has been restored, *1272 save two passages. With these conclusions, I am strongly in accord.
However, in several other determinations, I find myself unable to agree with the majority and, instead, would more extensively restore passages previously deleted from the two curricula.
Judges are not educators and the judiciary is not omniscient. Nor, in the present case, does judicial scrutiny permissibly extend beyond a determination of whether violations of LSA-R.S. 17:281 clearly transpired. Questions of academic merit rest within the province of the school board, not the courts.
Therefore, mindful of this, the statute before us should be narrowly construed so as to interfere with school board discretion only in instances where a clear and unequivocal violation is demonstrated. Put otherwise, if the statutory correctness of challenged material is merely questionable, courts should defer to the bona fide decisions of the legally constituted and presumably better equipped board, resisting any usurpation of authority to determine educational merit.
With reference to religious beliefs or subjective judgments, I do not read the statute to preclude the presentation of objective moral standards, those rules of conduct based on reason, logic, or rational intellectual processes, the kind of moral standards a reasonable person/parent believes to exist or should exist in society, or would like to have taught to his children. Granted, the legislature's prohibitions extend to 1) religious beliefs based solely upon a greater power or being, or upon a faith occupying an equivalent place in the life of the possessor, and 2) subjective moral or ethical judgments based on one's purely personal moral code or sincere personal devotion to a high moralistic philosophy independent of strict logic or proof.
Nonetheless, within these parameters, the word "spiritual" or "soul" does not ipso facto equate to the presentation of a religious belief. Nor does the word "moral" invariably set forth a subjective moral judgment. Instead, in the present case, many of the assailed passages or statements readily find support within rational intellectual processes, and without appeals to religious faith or personal moral judgments. This conclusion is, in several instances, also buttressed by the context in which the questioned matter has been presented. Moreover, the statute itself even embodies one specific objective moral standard: abstinence from premarital sex.
Consequently, I would go beyond the majority to restore to the respective curricula the following passages, all impugned by plaintiffs as teaching religious beliefs or subjective moral judgments:
SEX RESPECT (TEACHER GUIDE)
Human reproduction has a higher meaning than animal reproduction.
We don't discuss the psychological bond that confuses us when we perform an action that is designed to renew marriage vows and bind a couple that is united for life.
Modern psychology has proven that man is much more than an animal. He is also a mental and spiritual being.
SEX RESPECT (PARENT GUIDE)
According to Dr. Robert Coles, Psychiatrist at Harvard Medical School, "What children need as much as food, clothing, and a good education, is a moral purpose. Children need something to live for, not to yield to gross materialism, aimless hedonism and self-indulgence."
Sex in those early relationships, even when sincere, only multiplies the heartbreak and stress, while confusing the soulthe inner being that longs to express its real sexual self.
SEX RESPECT (STUDENT TEXT)
Although it may be more sharply focused in some boys than in others, he is experiencing a natural desire for sexual intercourse. His mind, guided by his moral *1273 values and also his will, helps him control and rechannel his desires.
As the AIDS plague and herpes are proving, faithful marital relations are good not only for society's moral tone, but for the individual's health too.
People are more than a higher kind of animal. People have mental and spiritual parts in their make-up that even "man's best friend" doesn't have.
A woman who waits can act in tune with her inner nature that says sex is a lifetime gift of love.
Sexual intercourse is designed to join a man and a woman who are committed to becoming one.
Emotional maturity comes when we have received the love from our family, friends and spiritual sources that makes us feel secure and whole.
What does all this say to the person who is already pregnant? Maybe she recognizes that she doesn't yet have the emotional, psychological, spiritual or financial resources to be a good parent.
FACING REALITY (PARENT/TEACHER GUIDE)
AIDS flourishes upon a moral landscape that places many sexual choices on a level terrain. AIDS will be most successfully contained within a moral landscape that makes it clear that self-serving sexual preferences are not on a level with self-discipline and commitment.
In view of this, it is absurd to suggest, as some have in the recent past, that human sexuality should not be taught within a moral framework in the public school.
Your task as adults is to help your community and school system define what moral expectations you wish to present to your children. Some of the main questions raised by this book are moral ones. Is it moral for your sons and daughters to engage in sexual activity before marriage? The physical, psychological and spiritual risks are overwhelming.
FACING REALITY (STUDENT GUIDE)
The use of contraceptive technology does not make teen sexual activity safe, moral or even legal.
Premarital sexual activity does not become a healthy choice or a moral choice simply because contraceptive technology is employed. Young persons will suffer and may even die if they choose it. The "mythology of contraception" must be challenged by anyone who teaches human sexuality.
In most instances, I agree with the majority in reference to the exclusions ordered due to factual inaccuracies. However, several of the challenged passages can be credibly defended, and thus should be restored:
SEX RESPECT (PARENT GUIDE)
Recent evidence indicates that sex education programs that instruct for genital activity with contraceptives and present abortion as a form of birth control have not, in fact, reduced the number of teen pregnancies. From 1970 to 1980, unwed teen pregnancies had increased from 300,000 to 750,000, even though it was reported that more teens were using contraceptives and using them more effectively.
Health texts tell us that the effects of premarital sex are sexually transmitted diseases and/or pregnancy.
SEX RESPECT (STUDENT TEXT)
Consequently, they sometimes give boys the impression they want to "go all the way" when actually they only want to be involved in the three early stages: togetherness, hand holding, and affectionate kissing.
I have counseled dozens of young males who have beaten or raped girls. In every case the male's excuse was that "she led me on." Ignorance of the steps of physical intimacy can have serious, even fatal, consequences.

*1274 What if she chooses abortion? Is it fair to make the baby pay for a bad decision she and her partner made? At first, the girl (and guy) may feel relieved that they no longer have to worry about the responsibilities of parenthood, but in the long run, they will feel guilt, depression, and anxiety. These feelings will make it nearly impossible for her ever to forget the abortion. If the girl is a young teen, pregnant for the first time, there's a chance the abortion will cause damage to her reproductive organs. Heavy loss of blood, infection, and puncturing of the uterus can all lead to future pregnancy problems, like premature birth or misplaced pregnancy (in which the baby begins to develop in a Fallopian tube or in the cervix, not in the uterus). There will also be an increased risk of miscarriage or birth complications with future pregnancies. Finally, the woman may suffer infertility, and be unable to become pregnant later, even when she is married, ready and eager for parenthood. Abortion is not the "easy way out" of an unplanned pregnancy.
Unfortunately, I neither share the view that the trial court extended appropriate deference to the board's decision and assessments, nor subscribe to the majority's expression of dicta concerning impartiality within the proceedings below.
In the aspects indicated, I respectfully dissent.
Before MARVIN, C.J., and NORRIS, HIGHTOWER, BROWN and WILLIAMS, JJ.

ON APPLICATION FOR REHEARING
PER CURIAM, granting in part a rehearing to correct assessment of trial court costs and otherwise denying applications for rehearing.
The trial court's reasons for judgment on the merits given on March 18, 1993, assessed all trial court costs one-half against the Caddo Parish School Board and one-half against the intervenor Committee. The trial court's judgment of March 18, 1993, however, was silent as to the assessment of court costs.
The Board's application for a rehearing complains that this court in the recast decree assessed trial court costs wholly against the Board. We grant the Board's application in that respect and hereby amend our recast decree to assess all trial court costs one-half against the Board and one-half against the intervenor Committee and to assess appellate costs one-half against plaintiffs and one-half against the Board and the Committee.
Otherwise the applications for rehearing are denied. Judge Hightower would grant a rehearing on the applications by the Board and the Intervenor in the appeal, Docket No. 25,617-CA, and would deny all other applications.
HIGHTOWER, J., dissents with written reasons.
HIGHTOWER, Judge, dissenting from the denial of a rehearing.
The previous opinion evades the central issue of this case: What are "religious beliefs" or "subjective moral and ethical judgments" as prohibited by the statute? Instead, without defining either term, the original majority proceeded to exclude numerous challenged passages on grounds that the language therein reflected either religious beliefs or subjective moral and ethical judgments.
The question presented is one of statutory interpretation, and this court has not faced its responsibility.
The applications for rehearing, filed by the Board and the Intervenor, should be granted. Furthermore, even under the present judgment, one-half of the costs should be assessed against the plaintiffs, both in the trial court and on appeal.
I respectfully dissent from the denial of the applications indicated.